**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**Alvin R. CAMPBELL, Defendant,
Appellant.**

**No. 83–1222.**

United States Court of Appeals,
First Circuit.

Argued March 8, 1984.

Decided April 26, 1984.

Opinion on Rehearing June 7, 1984.

---

Richard M. Egbert, Boston, Mass., by appointment of the Court, for appellant.

William C. Bryson, Atty., Dept. of Justice, Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., and Patrick M. Walsh, Sp. Atty., U.S. Dept. of Justice, Boston, Mass., were on brief, for appellee.

Before COFFIN, ALDRICH and BOWNES, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Defendant Campbell, not a stranger to this court,[1] or to a number of others, was convicted on a six count indictment, five involving firearms, and one cocaine. On this appeal he raises three principal complaints; one, to the denials of his motion to suppress; two, alleging inadequacy of the evidence as to cocaine, and three, challenging the court's admission of evidence of his refusal to execute handwriting exemplars. Other claims we have noted, but do not find to require comment.

Most of the evidence was obtained in a search of Campbell's apartment pursuant to a warrant issued for "cocaine" and "a 30 calibre carbine assault rifle and a 25 calibre auto pistol." The search discovered various cocaine paraphernalia, including scales, cutting and other equipment, and approximately 1,000 glassine envelopes, but no cocaine except measurable residue attached to the equipment. Also discovered, concealed in various receptacles, were four firearm silencers, unregistered, in violation of 26 U.S.C. § 5861(d), and three rifles and two handguns, some or all of which were also concealed.

We deal first with the motion to suppress with respect to cocaine. The basis of the warrant had been an affidavit by drug officer Manzi. This, in turn, was based upon statements to him by a Chester Smolenski, and a confidential informant, hereafter CI. Smolenski had had no previous connection with the police as an informant except, apparently, to have reported to the state police in June 1980, that defendant, with whom he had allegedly been previously associated, had assaulted and robbed him. Smolenski informed Manzi in August, 1982 that he had dealt in cocaine with defendant until their falling out in 1980, and that since then he feared for his life. Other than this, Smolenski figured only in the firearms aspect of Manzi's affidavit.

CI spoke with Manzi on several occasions in the fall of 1982, telling him he had been in defendant's apartment in July, August, and September, and had seen cocaine and various cocaine paraphernalia, and that defendant had offered to front cocaine to CI for sale and later payment. In support of his reliability, the affidavit noted that CI had identified a photograph of the defendant, and had been seen on occasions to enter defendant's premises. His name and address were known to the police; he had no known motive to lie, received no inducement, and came forth on his own. Judging the total circumstances, *Illinois v. Gates*, 1983, 462 U.S. 213, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, and the deference due the magistrate's findings, *United States v. Ventresca*, 1965, 380 U.S. 102, 107–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684, although the question may be close, we find these factors, cumulatively, to furnish a sufficient independent "substantial basis" for crediting CI's account. *Illinois v. Gates*, ante, 103 S.Ct. at 2327–31 *United States v. Harris*, 1971, 403 U.S. 573, 581, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723. In substitution for a track record of reliability is the fact that he was not a professional informant, but a private citizen with no known criminal record or other criminal contacts, who came forward on his own. Under such circumstances the informant's story may be more easily accepted, and we believe the magistrate justified in doing so here. *See Gates*, ante, 103 S.Ct. at 2329; *United States v. Burke*, 2 Cir., 1975, 517 F.2d 377, 379–81; *United States v. Mark Polus*, 1 Cir., 1975, 516 F.2d 1290, *cert. denied*, 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127. Nor was the information too stale when it came to assessing probable cause for possession of cocaine in November, in view of the past history indicating a continuing business. *See United States v. Hershenow*, 1 Cir., 1982, 680 F.2d 847, 853; *United States v. DiMuro*, 1 Cir., 1976, 540 F.2d 503, 515–56.

---

1. *Campbell v. United States*, 1 Cir., 1962, 303 F.2d 747, *rev'd*, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501.

■ The situation with regard to firearms is much more troubling. According to Smolenski, defendant robbed and assaulted him in June 1980, using a 357 magnum revolver and a 25 calibre automatic pistol. At that time defendant "always carried a gun." At some undisclosed date a certain CII, a confidential informant to Smolenski, gave Smolenski "two empty shell casings, one from a 30 calibre carbine, the other, a 30 calibre auto." We assume, from reading the affidavit as a whole, as well as from the fact that the court is unaware of automatics between 25 and 32 calibre, that the second "30" was a typo for 25. CII told Smolenski, again without date, that these weapons were in defendant's possession, and that defendant was planning to kill Smolenski with one of them. The affidavit concluded,

> "Due to the afore-mentioned facts, information and circumstances previously mentioned in the affidavit and due to the nature of criminal activity and the continuing pattern of Campbell's criminal activity, there is probable cause to believe that the items previously mentioned in this affidavit will be likely to remain in Campbell's possession or in his bedroom in connection with his unlawful criminal activity and personal criminal history."

The "personal criminal history" consisted of numerous criminal convictions, the last in 1970 on a gun charge, and the assertion he had robbed Smolenski in 1980, and was engaged in the cocaine business.

Nothing was known to the police about CII, and there would seem, even in the totality of the circumstances, no substantial basis for accepting his hearsay on hearsay. Shell casings could come from anywhere. One could not find probable cause that defendant was presently in possession of a 30 calibre rifle on the basis that a hitherto unknown informant had said that some other individual, known only to him, had given him a casing, at some undisclosed date, allegedly coming from such a rifle in defendant's possession. While we would accept Smolenski's statement that defendant carried a 25 automatic in 1980, we could not regard this, and CII's assertion that he still had it at some undisclosed date, sufficient cause to believe it would be found in defendant's apartment in November 1982. If such minor matters can constitute probable cause for a firearms

search warrant, any individual with a criminal record involving firearms, and acceptable probable cause with respect to cocaine, can be searched for arms at any time. The government cites no authority for such a broad proposition, and we must hold that the court erred in concluding that there was probable cause to search for firearms. *Cf. United States v. Harris*, ante, 403 U.S. at 582, 91 S.Ct. at 2081 (criminal reputation, standing alone, insufficient to establish probable cause.).

■ This does not mean that the firearms must necessarily be suppressed. If the district court should conclude on remand that the police discovered the, or some of the, firearms and silencers during the course of a legitimate search for cocaine, then these items might be admissible. *See, e.g., United States v. Winston*, E.D.Mich., 1974, 373 F.Supp. 1005, *aff'd*, 6 Cir., 1975, 516 F.2d 902; 2 W. LaFave, *Search and Seizure* § 4.11 (1978). We express no final opinion on this question, however, because it was not addressed, either factually or legally, by the district court or the parties.

■ Defendant next challenges the sufficiency of the evidence with respect to his conviction for cocaine. The indictment charged possession with intent to distribute "on or about" November 23. During its deliberation the jury requested instructions, and was told that it could convict defendant of intent to sell cocaine other than the found residue if it concluded that he had had further cocaine for sale within a reasonable time of the date stated in the indictment. As to this we find no error. Where the time of an offense is not important, it may be alleged generally, and "on or about" permits a reasonable variance in dates. *See United States v. Nunez*, 1 Cir., 1981, 668 F.2d 10, 11–12; *United States v. Antonelli*, 1 Cir., 1971, 439 F.2d 1068, 1070. In view of the amount of equipment discovered, still with residue present, it would be reasonable for the jury to conclude that defendant was conducting an ongoing business, and that more substantial amounts of cocaine had been present within a reasonable time of the discovery.

There was, however, prejudicial error with regard to the cocaine conviction. The court allowed the government to show that defendant violated the court's order to furnish handwriting exemplars. From this

the government was permitted to argue the jury's right to draw unfavorable inferences. Defendant challenges this as violating his Fifth Amendment right to avoid compelled testimonial self-incrimination, magnified by permitting comment thereon. At first blush there might appear to be no possible merit in this complaint, it being well settled that handwriting is a matter of physical characteristics which may be demanded without infringing constitutional rights. *See United States v. Euge,* 1980, 444 U.S. 707, 713, 100 S.Ct. 874, 879, 63 L.Ed.2d 141. Indeed, it is the stock in trade of handwriting experts that some characteristics are so personally entrenched that disguise is almost impossible. *See* Harrison, Suspect Documents, (1958) 292, 349–51. In *Gilbert v. California,* 1967, 388 U.S. 263, at 266–67, 87 S.Ct. 1951, at 1953–54, 18 L.Ed.2d 1178, the Court said, in holding that handwriting exemplars constitute "real or physical evidence" not within the Fifth Amendment privilege protecting communications,

> "One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. *A mere handwriting exemplar, in contrast to the content of what is written,* like the voice or body itself, is an identifying physical characteristic outside its protection. *United States v. Wade, supra,* [388 U.S. 218] at 222–223 [87 S.Ct. 1926 at 1929–1930, 18 L.Ed.2d 1149]. No claim is made that the content of the exemplar was testimonial or communicative matter." (Emphasis suppl.)

■ The government here, however, did not limit its demand to handwriting exemplars as such. When the agent stated the words he wished written down, defendant replied that he wanted to see what he was to write, rather than take dictation. When the agent refused, defendant's counsel asked whether the agent would permit counsel to write out what defendant was to write, but this, too, was rejected on the ground—which was the fact—that the court had approved the government's proposed dictation procedure. Defendant refused to comply, even though the court held him in contempt.

The only difference we see between dictation and being shown the words to write would be to discover defendant's choice of spelling. Asked by us why this was not testimonial content as distinguished from a "mere exemplar," the government's only response was to cite *United States v. Pheaster,* 9 Cir., 1976, 544 F.2d 353, *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546, where, at 372, the court said, in reply to the defendant's claim that taking dictation might disclose that he misspelled words,

> "Like spelling, penmanship is acquired by learning. The manner of spelling a word is *no less* an 'identifying characteristic' than the manner of crossing a 't' or looping an 'o'. All may tend to identify a defendant as the author of a writing without involving the content or message of what is written." (Emphasis suppl.)

The *Pheaster* court got off on the wrong foot. Basic penmanship, of course, is learned, but to say that the ultimate handwriting is an intellectual process of learning, as distinguished from physical form, is simply not so. The distinction is what caused the Court, ante, to exempt compelled handwriting from the Fifth Amendment. We agree that spelling may be an identifying characteristic *no less* than handwriting idiosyncrasies. The trouble is, from the standpoint of the Fifth Amendment, that it may be something more. When he writes a dictated word, the writer is saying, "This is how I spell it,"—a testimonial message in addition to a physical display. If a defendant misspelled a common word, and the document sought to be attributed to him misspelled it the same way, could it be thought that the government would not, quite properly, *United States v. Russell,* 3 Cir., 1983, 704 F.2d 86, 91, argue that there was a message? Indeed, the *Pheaster* court said exactly that, "The manner of spelling a word is ... an 'identifying characteristic,' " and then drew the wrong conclusion. Not surprisingly, the court cited no authority for its position.

This might be tested another way; could the defendant be put on the stand and given a spelling test? Obviously, compelled answers would be testimonial, or communicative. Yet that is precisely what the government proposed. At the same time, it did not deny that it had a probation file containing defendant's handwriting, both recent and old. We are not surprised that he suspected the government of wanting something other than handwriting.

Alternatively, the government claims that defendant, through cross-examination of the agent, was permitted to bring out essentially why he refused to comply. We do not think so, but much less could we think a jury of laymen would find any self-asserted reason defendant might give would offset the court's order and the inference the court charged could be drawn from non-compliance. The order invaded defendant's Fifth Amendment rights, and no protest by him could cure the consequence of permitting adverse comment upon his exercising them.

The government, properly, does not contend that, if error, it was harmless. Defendant was not the only occupant of the apartment, and in this case the inferences drawn from his refusal could have helped establish possession of the cocaine. Quite apart from this, portraying defendant as one who deliberately disobeys a court order because he fears the consequences of obedience, could not help but be prejudicial.

The convictions on all counts, the order denying the motion to suppress the firearms, and the order for contempt, are vacated, and the case is remanded for further proceedings consistent herewith.

### On Rehearing

ALDRICH, *Senior Circuit Judge.* On petition for rehearing the government has been prompted to cite an FBI regulation, and advance reasons why, from the standpoint of obtaining accurate handwriting exemplars, there may be proper advantages in dictation over a written request; e.g., speed and surprise, to reduce conscious manipulation. We accept this, but add that it should have been said before. We remain of opinion, however, that spelling is an intellectual process as distinguished from the pure physical habit or characteristics that make handwriting demandable, and are surprised at the government's persistence in arguing otherwise. Requiring an intellectual process, however subtly, over objection, is a clear violation of the Fifth Amendment.

Nor will we accept the government's undertaking not to rely upon misspelling comparisons. Even if no mention were made of it, a jury could well notice a duplication of mistakes. On the new trial we will permit the use of dictated exemplars, but only on the basis that, if any misspelling occurs, the jury be instructed—whether in fact true or not—that the government dictated the spelling, and that no inference is to be drawn therefrom. If defendant refuses to comply even on this basis, comment on the refusal shall be permitted.

The petition for rehearing is otherwise denied.