UNITED STATES of America,

v.

Samuel MATOS, Defendant.

No. 97 CR 803(JG).

United States District Court,
E.D. New York.

Jan. 7, 1998.

Leonard F. Joy, The Legal Aid Society, Federal Defender Div., Brooklyn, NY by Cynthia A. Matthews, JaneAnne Murray, for Defendant.

Zachary Carter, U.S. Atty., E.D. New York, Brooklyn, NY by Jill Feeney, Asst. U.S. Atty., for U.S.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Samuel Matos, Jr., is charged in a four-count indictment with two counts of bank robbery (arising out of robberies committed on August 28, 1992, and September 18, 1992), and with carrying a firearm during each robbery. The defendant has moved to suppress certain handwriting exemplars taken from him on the ground that the circumstances in which they were given amounted to a violation of his Fifth Amendment right against self-incrimination. For the reasons set forth below, the motion is denied.

### FACTS

#### A. The Charged Robberies

On August 28, 1992, a man with a gun robbed the National Westminster Bank at 6901 Fifth Avenue in Brooklyn. The robber handed the teller a note and a gray plastic bag. The note was returned to the robber in the bag along with some money.

On September 18, 1992, a gun-toting robber handed a note and a bag to a teller at the Hamilton Federal Savings Bank at 240 Court Street in Brooklyn. The note from that robbery will be an exhibit at trial. It directed the teller to, *inter alia*, "Put all your (from *both draws* (sic)) $500.00, $100.00, $50.00, $20.00 Etc. in the bag" (emphasis in original).

#### B. The Uncharged Attempted Robbery

The government intends to offer, pursuant to Fed.R.Evid. 404(b), an attempted robbery of a Chemical Bank branch at 280 Graham Avenue (presumably in Brooklyn) on September 4, 1992. The would-be robber used a note, which the government intends to offer at trial. The note from this robbery is strikingly similar, in content and appearance, to the above-quoted note used two weeks later by the robber of the Hamilton Federal Savings Bank. However, the word "drawers" does not appear in any form on the note used at Chemical Bank.

#### C. The Investigation

On November 12, 1996, a grand jury subpoena was issued commanding Matos to provide, among other things, handwriting exemplars to the grand jury on November 29, 1997. However, the subpoena stated that compliance could be accomplished by providing the exemplars to Pamela Lane, an agent of the Federal Bureau of Investigations ("FBI"), at her office. Agent Lane's office address and telephone number were set forth on the subpoena. After receiving the subpoena, Matos telephoned Agent Lane and arranged to provide an exemplar at her office on December 3, 1996. Matos arrived at the FBI office on that date by himself.

Matos was advised by Agent Lane and Agent Lynn Willet that they were investigating three bank robberies. They instructed him not to talk about the bank robberies, and told him that if he wanted to do so, he should have an attorney present. The defendant never requested counsel or stated that he wanted to leave. No guns or handcuffs were displayed or used.

The agents proceeded to take the exemplars from Matos. For some of the exemplars, he was given documents to copy. For example, he was given a newspaper article, which he was told to read and then copy. For other exemplars, however, he was directed to write down words that were read to him by the agents. The words that were read to him included words from the two notes that the government plans to introduce as evidence at trial. Matos was also asked to write a series of monetary amounts.

According to an affidavit provided by Agent Lane, the agents gave specific directions to Matos as to how certain dictated terms should be written. They instructed him (1) how to write the numbers, *e.g.*, he was not instructed to write "one hundred dollars;" rather, he was instructed to write "dollar sign, one, zero, zero, decimal point, zero, zero;" (2) to write the word "til"(rather than "until"); and (3) to underline certain terms that were underlined in the bank robbery notes. However, the defendant was not instructed as to how to spell the word "drawers."

The handwriting exemplars provided by the defendant and the bank robber's note from the September 18 robbery contain the same misspelling of the word "drawers;" in both, the word is spelled "draws."

D. *The Arrest, Indictment and Motion To Suppress*

Matos was arrested on a warrant on July 30, 1997. He was indicted on August 28, 1997. On November 26, 1997, he moved to suppress the handwriting exemplars on the ground that, by dictating what was to be written, the agents violated his Fifth Amendment right against self-incrimination. Trial is scheduled to begin on January 12, 1998.

In opposition to the motion, the government argued only that there was nothing testimonial about the provision of the exemplars, and thus the Fifth Amendment was not implicated. At oral argument on December 19, 1997, I requested additional briefing on the question whether the defendant's failure to assert the Fifth Amendment privilege at the time the exemplars were provided precluded its assertion now. Letter briefs on that issue have since been filed.

I agree with the defendant that he provided testimonial communication in addition to handwriting samples when the exemplars were taken. However, because he failed to assert his Fifth Amendment privilege at that time, his motion to suppress the exemplars is denied.[1]

## DISCUSSION

A. *The Defendant's Spelling Of Words In The Exemplars Constituted Testimony*

In support of his claim that the handwriting exemplars were taken in violation of his Fifth Amendment right against self-incrimination, the defendant distinguishes samples produced by dictation from those produced by copying written material. The defendant acknowledges that the compulsion of handwriting samples has generally been held not to violate the Fifth Amendment, but correctly asserts that this is true only where no claim is made that the provision of the exemplars is testimonial or communicative in nature. *See Gilbert v. California*, 388 U.S. 263, 267, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

The defendant relies primarily on two cases. In *United States v. Wade*, 1995 WL 464908 (S.D.N.Y. Aug.4, 1995), the court denied the government's motion to compel the defendant to provide handwriting samples of

---

1. In papers relating to the motion and at oral argument on December 19, 1997, counsel agreed that the misspelling of the word "drawers" lies at the heart of the defendant's application, and that the exemplars at issue would be used by the government at trial with that word redacted if the motion were granted. This agreement was apparently the result of the government's supplemental subpoena for additional exemplars to be used in the event the motion were granted. On December 30, 1997, another attorney from the

Office of the Federal Defender apparently reneged on that agreement, arguing that an order granting the motion would not only "taint" the exemplars, but would also taint the testimony of any expert who was exposed to the misspelling. In light of my disposition of the Fifth Amendment claim, this eleventh-hour argument (which defense counsel conceded is the result of "too many cooks" on the defense team) is denied as well.

dictated material. It found that such samples would reveal not only the defendant's penmanship, but also his spelling abilities and the form in which he wrote numbers on checks. The court reasoned that while handwriting generally is "regarded as a means of communication that lacks communicative intent," the compulsion of samples by dictation requires a defendant to demonstrate his "his thought processes, which have communicative qualities," and is therefore prohibited by the Fifth Amendment. *Id.* at *2.

Similarly, in *United States v. Campbell*, 732 F.2d 1017 (1st Cir.1984), the First Circuit found prejudicial error where the government was permitted at trial to point out that the defendant had defied a court order to give such handwriting samples. The court focused on the testimonial nature of the defendant's spelling abilities, explaining that "when he writes a dictated word, the writer is saying 'This is how I spell it,'a testimonial message in addition to a physical display." *Id.* at 1021.

For its part, the government relies on the Ninth Circuit's rejection of the argument that handwriting exemplars from dictation constitute a communication, the compulsion of which is prohibited by the Fifth Amendment. *United States v. Pheaster*, 544 F.2d 353 (9th Cir.1977), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Rather, the court found that

> like spelling, penmanship is acquired by learning. The manner of spelling a word is no less an 'identifying characteristic' than the manner of crossing a 't' or looping an 'o'. All may tend to identify a defendant as the author of the writing without involving the content or message of what was written.

*Id.* at 372.

■ I agree with *Wade* and *Campbell*. *Pheaster*'s summary dismissal of the defendant's Fifth Amendment claim failed to focus on the obvious testimonial component of such handwriting exemplars. Requiring a person to provide an exemplar from dictation that does not provide the spelling of the dictated words is the functional equivalent of requiring the person to state how he spells the dictated words. The answer may well serve to identify the person as the perpetrator of a crime, but that does not render it an "identifying characteristic" akin to fingerprints or blood type, as the Ninth Circuit found in *Pheaster*. "A mere handwriting exemplar, *in contrast to the content of what is written,* like the voice or body itself, is an identifying physical characteristic outside [the Fifth Amendment's] protection." *Gilbert*, 388 U.S. at 266–67 (emphasis added). This case places that distinction in clear relief. There is no dispute that a very incriminating aspect of the defendant's exemplars is the content of what he wrote, specifically, his spelling of the word "drawers." This incriminating feature of the exemplars cannot reasonably be said to arise from Matos's "mere handwriting;" indeed, it would be present even if he had typed the words dictated to him by the agents. Spelling is the result of the operation of a person's mind, the expression of which generally falls within the Fifth Amendment's protection. "There are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts. The vast majority of verbal statements thus will be testimonial and, to that extent at least, will fall within the privilege." *Doe v. United States*, 487 U.S. 201, 213–14, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988). The verbal statement here—the defendant's spelling of a particular word—is testimonial. But for the roundabout way in which the defendant was asked to make it, I do not believe the issue would have arisen. If the subpoena had called for the defendant's testimony before the grand jury, and the first question to him had been "How do you spell 'drawers?'," the government would be hard-pressed to argue, in response to an assertion of the privilege with respect to that question, that the answer would not constitute testimony. The provision of that information by writing out dictated words does not render it any less testimonial.

### B. The Defendant Is Foreclosed From Invoking The Privilege

Under ordinary circumstances, in order for a witness to avail himself of the protection of the Fifth Amendment, "he must claim it or he will not be considered to have been 'com-

pelled' within the meaning of the Amendment." *United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943). This principle has been applied in a variety of Supreme Court cases, which, taken together, "stand for the proposition that, in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Garner v. United States,* 424 U.S. 648, 654, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). In *Garner,* for example, the defendant was foreclosed from invoking the privilege when his tax returns were offered against him in a criminal prosecution because he had failed to invoke it on the returns, choosing instead to make the incriminating disclosures. *Id.* 424 U.S. at 665.

█ Thus, the general rule is that the Fifth Amendment privilege is not self-executing; it must be claimed by the witness. The Supreme Court has acknowledged, however, that there are certain "narrowly defined situations" in which incriminating disclosures are considered "compelled" despite a failure to claim the privilege. *Id.* at 656. One of those situations, of course, is a custodial interrogation. *Id.* at 657; *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, there is no contention here that Matos was subjected to such an interrogation. Indeed, in a letter submitted yesterday, defense counsel concedes that he was not. Rather, the defendant relies solely on the fact that Matos was subject to subpoena as the basis of his claim that the exemplars were coerced from him in violation of the Fifth Amendment. He contends that the subpoena was a gun to his head, coercing him to provide information, and that the Fifth Amendment required that coercion to be "dissipated by (at the very least) advising him of his right to refuse to answer any questions that may incriminate him." Letter from JaneAnne Murray dated January 6, 1998, at 2.

The Supreme Court has not squarely resolved the question whether *Miranda*-type warnings must be given to grand jury witnesses who are targets of the investigation. *See United States v. Washington,* 431 U.S. 181, 190, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977)(because modified *Miranda* warnings were given to the grand jury witness, "we do not decide whether such warnings were constitutionally required"). However, the Court has held that a probationer's obligation to appear and answer his probation officer's questions did not in itself convert his admissions to the officer into compelled incriminations. *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). The court's reasoning and language in that case seem incompatible with Matos's argument:

> We note first that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones. In that respect, Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege.

*Id.* I agree with two prominent commentators' assertion that, if the Supreme Court addresses the issue head-on, it will hold that the Constitution does not require the administration of warnings to testifying targets in the grand jury, *see* Sara S. Beale and William C. Bryson, *Grand Jury Law And Practice* § 6:15 at 83–84 (1995), even though warnings might serve to dissipate a grand jury witness' misimpression that he must answer incriminating questions truthfully. *Minnesota v. Murphy,* 465 U.S. at 431.

Of course, Matos did not appear in the grand jury. Pursuant to a common practice, the prosecutor noted on the subpoena that Matos could comply by providing the exemplars to Agent Lane at her office. Although this practice is not beyond controversy, it makes sense to permit it. The provision of exemplars is often a time-consuming task, and the utility of the exemplars themselves generally requires meticulous comparison of

the exemplars with other, questioned documents. It scarcely makes sense to require the arduous task of providing exemplars to occur in the grand jury room if the person under subpoena does not insist on it. *See United States v. Smith*, 687 F.2d 147, 152 (6th Cir.1982), *cert. denied*, 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983). In any event, the defendant makes no challenge to the use of the subpoena to obtain the exemplars at the FBI offices.

Arguably, however, the fact that Matos did not appear in the grand jury room strengthens his claim that *Miranda*-type warnings were required. The argument goes as follows: the grand jury room is not a police station, where inherently coercive questioning can occur in the presence of only the police. To the contrary, it is a quintessentially public setting, as interrogations go, subject to the supervision of the district court, and thus is far less conducive to the kinds of coercive tactics that can occur in custodial interrogations. *See* Beale & Bryson, § 6:15 at 84. Thus, even if warnings are not required when a target is subpoenaed to the grand jury, one might argue that they are required when he is, in effect, subpoenaed to the FBI office, at least when he is then required to provide testimonial communications.

I hasten to note that this argument has not been made here. As stated above, Matos relies solely on the fact that he was subpoenaed to provide exemplars. In any event, the available facts suggest that the option of providing the exemplars to the agents was a more attractive, and less coercive, alternative for Matos than appearing before the grand jury. He was able to arrange a time over the telephone, and thus was not required to appear only when the grand jury was in session. Although the exemplars were provided in the privacy of the agents' office, Matos does not contend that they engaged in coercive tactics. There is no indication that the option to provide the exemplars directly to the agents was viewed by Matos as a mandatory direction. Finally, the presence of grand jurors notwithstanding, an appearance to provide physical evidence or testimony under oath to a federal grand jury can, in some circumstances, be more intimidating even than a visit to the FBI's office. Whether or not that was true here, I find under the totality of the circumstances that there is not even the slightest suggestion that Matos's free will was overborne. *See Minnesota v. Murphy*, 465 U.S. at 431 (declining to require warnings to probationer who was required to answer probation officer's questions where the totality of the circumstances were not such as to overbear the probationer's free will).

▮ In sum, I conclude that neither the grand jury subpoena nor the prosecutor's suggestion of a "convenient alternative" to an appearance before the grand jury, *Smith*, 687 F.2d at 152, created one of those "narrowly defined situations" in which incriminating disclosures may be deemed compelled despite a failure to assert the Fifth Amendment privilege. *Garner*, 424 U.S. at 656.

### CONCLUSION

Because the defendant did not claim the Fifth Amendment privilege at the time the handwriting exemplars were given, he is foreclosed from invoking the privilege in order to suppress the handwriting exemplars. Accordingly, the defendant's motion to suppress is denied.

So Ordered.