UNITED STATES of America,

v.

Roy VAN WYK, Defendant.

No. Crim. 99–217(WGB).

United States District Court,
D. New Jersey.

Feb. 8, 2000.

Charles B. McKenna, Asst. U.S. Atty., United States Attorney's Office, Newark, NJ, for U.S.

John H. Yauch, Assistant Federal Public Defender, Newark, NJ, for defendant.

## OPINION

BASSLER, District Judge.

This opinion addresses the question whether an agent of the FBI can testify as a forensic stylistic expert and whether forensic stylistics is a reliable technique to allow the expert to identify Defendant as the author of unidentified threatening letters.

This matter comes before the Court on the Defendant's *in limine* motion to exclude the testimony of the Government's expert witness FBI Special Agent James R. Fitzgerald ("Fitzgerald" or "Agent Fitzgerald"). For the reasons set forth below, the Court grants in part Defendant's motion to exclude Fitzgerald's testimony by limiting his testimony to the comparison of characteristics or "markers" between handwritten and typed writings, in which Defendant is known to be the author ("known writings") and the handwritten and typed writings, in which authorship is "questioned" or unknown ("questioned writings"). Fitzgerald's testimony regarding any "external" or extrinsic factors and his conclusion as to the author of the "questioned" writings are barred.

## I. BACKGROUND

Defendant Roy Van Wyk ("Defendant") has been charged with a four count Su-

perseding Indictment. Count One alleges that from January 1993 through December 1998, Defendant conspired to make threatening communications in violation of 18 U.S.C. § 875. Counts Two and Three allege two specific instances of threatening communications made to victims "MJ" and "GW." Count Four charges Defendant with possession of a firearm by a convicted felon in violation of Title 18 U.S.C. § 922(g)(1) and (2).[1]

Defendant seeks to exclude the proposed expert testimony of Agent Fitzgerald. Fitzgerald testified at a F.R.E.Rule 104 evidentiary hearing on February 3, 2000.[2] The Government presents Agent Fitzgerald as an expert in forensic stylistics,[3] an area of scientific expertise which the Government has conceded is novel. (February 3, 2000 Hearing Transcript ("Hearing Tr."), at 179.) Forensic stylistics is the examination of writing style "for the express purpose of resolving litigated questions related to disputed authorship or meaning." McMenamin, G. *Forensic Stylistics*, 58 Forensic Science Int'l, 1, 45 (1993) (hereinafter "McMenamin article"). More specifically,

> [i]n cases of disputed authorship, the linguist analyzes and describes the style of writing of a document of questioned authorship and compares and contrasts its language to that of documents known to be written by a given author.

*Id.* at 3.

For purposes of this motion, it is helpful to divide Fitzgerald's opinion into three components: (1) internal evidence, which is actual comparisons of similarities or "markers" within the "four corners"[4] of the known and questioned writings; (2) external or extratextual evidence, such as "known dates of composition, date and location of mailing, DNA evidence, and the like";[5] and (3) opinion that the author of all the questioned writings is the same individual and that Defendant is that author.

Defendant argues that Agent Fitzgerald is not qualified to testify as a forensic stylistics expert. Defendant notes that no expert has yet testified in the area of linguistic stylistics, indicating its lack of reliability. Moreover, the jury is capable of comparing samples of writings without Fitzgerald's testimony.

## II. *DISCUSSION*

### A. *Standard Governing Admissibility of Expert Opinions*

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

1. By Order dated January 12, 2000, the Court severed Count Four from the other counts.

2. On February 4, 2000, after the conclusion of a jury charge conference, counsel made additional arguments as to the admissibility of Agent Fitzgerald's testimony.

3. At oral argument on February 4, 2000, the Government withdrew its proffer of Agent Fitzgerald as an expert in forensic stylistics and instead proffered him as an expert in text analysis. Forensic stylistics and text analysis both involve the examination of text or writing style; the only difference that the Court can glean between forensic stylistics and text analysis is that forensic stylistics is specifically geared towards resolving litigated questions related to disputed authorship or meaning.

4. The four primary categories are: punctuation, orthography or spelling, grammar, and "other." Hearing Tr. at 130. For example, in some of the questioned typed writings, Fitzgerald notes that with respect to the use of an apostrophe in a possessive word or in a contraction, the writer either completely omits the apostrophe or instead substitutes improper punctuation, such as a comma or quotation mark. Fitzgerald Report, at 10–11.

5. Fitzgerald Report, at 2.

Fed.R.Evid. 702. The Rule therefore has three fundamental requirements: (1) the proffered witness must qualify as an expert by knowledge, skill, experience, training, or education; (2) the expert must testify to scientific, technical, or other specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *United States v. Velasquez,* 64 F.3d 844, 849 (3d Cir.1995). When faced with a proffer of expert testimony, the court must make a preliminary determination as to all of these Rule 702 requirements. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The Third Circuit has interpreted the first requirement of Rule 702 liberally. *See e.g., In Re Paoli R.R. Yard PCB Litig.* (*"Paoli I"*), 916 F.2d 829, 855 (3d Cir. 1990) (exclusion is not proper remedy simply because experts did not have degree or training that district court thought would be most appropriate). "We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *In Re Paoli R.R. Yard PCB Litigation* (*"Paoli II"*), 35 F.3d 717, 741 (3d Cir.1994); *see Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3d Cir.1982) (holding that an engineer, whose only qualifications were sales experience in field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in products liability action involving tractors); *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87–88 (3d Cir. 1979) (holding that expert could testify that unguarded elevator buttons constituted design defect despite expert's lack of specific background in design and manufacture of elevators).

The proposed expert must possess knowledge, skill, experience, training, *or* education in the area of his or her testimony greater than the average layperson. *See Aloe Coal Co. v. Clark Equipment Co.,* 816 F.2d 110, 114 (3d Cir.1987); *Ebeling & Reuss, Ltd. v. Swarovski Int'l*

*Trading Corp., A.G.,* 1992 WL 211554, at *20 (E.D.Pa. Aug.24, 1992). The proposed expert "should not be required to satisfy an overly narrow test of his own qualifications." *Gardner v. General Motors Corp.,* 507 F.2d 525, 528 (10th Cir.1974); *see also DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 956 (3d Cir.1990) ("Rules 701–703 relating to expert testimony provide for the admission of evidence with any marginal utility absent a substantial countervailing concern.") The expert need not have complete knowledge about the field in question, need not be certain, and need not be unbiased. 3 *Weinstein's Evidence,* ¶ 702[4]. The expert must only be able to aid the jury in resolving a relevant issue. While the level of expertise may affect the weight to be accorded the expert's opinion, it does not affect admissibility.

The Third Circuit has held that it is an "abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co., Inc.,* 80 F.3d 777, 782 (3d Cir.1996) (reversing district court for excluding testimony of plaintiff's expert regarding alleged causes of mesothelioma in asbestos case).

"The second requirement of Rule 702— that the expert testify to scientific, technical or other specialized knowledge—is intended to ensure the reliability or trustworthiness of the expert's testimony." *Velasquez,* 64 F.3d at 849 (citing *Daubert,* 509 U.S. at 590–91, 113 S.Ct. 2786). An expert's opinion must be "reliable," that is, based on valid reasoning and reliable methodology, as opposed to "subjective belief or unsupported speculation." *Kannankeril v. Terminix Int'l,* 128 F.3d 802, 806 (3d Cir.1997) (citations omitted). "[I]f an expert opinion is based on speculation or conjecture, it may be stricken." *Fedorczyk v. Caribbean Cruise Lines, Ltd.,* 82 F.3d 69, 75 (3d Cir.1996). Expert testi-

mony cannot be based on "pure speculation, rather than reasonable inference." *Fedorczyk,* 82 F.3d at 75.

■ When presented with a proffer of expert "scientific" testimony, the court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. To do so, the court should consider the following factors, in addition to any other applicable factors: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses of the method. *Velasquez,* 64 F.3d at 850 n. 8 (citing *Paoli II,* 35 F.3d at 742 n. 8); *Daubert,* 509 U.S. at 593–95, 113 S.Ct. 2786.

Finally, the Court must consider the third requirement, whether the expert's testimony will "assist the trier of fact" to understand evidence or determine a fact in issue. This requirement goes primarily to relevance. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. The proffered expert's testimony must "fit" under the facts of the case so that "it will aid the jury in resolving a factual dispute." *Id.* (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). *Daubert's* requirement that the court act as gatekeeper for expert testimony under F.R.E.Rule 104(a) "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

The party seeking to admit expert testimony "bears the burden of establishing its admissibility by a preponderance of proof."

*Schmaltz v. Norfolk & Western Railway Co.,* 878 F.Supp. 1119, 1120 (N.D.Ill.1995) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995)); *see also United States. Libutti,* 1994 WL 774646, at *1 (D.N.J. Feb.8, 1994) (noting that court had previously determined that defendant had not met his preliminary burden on proffered expert testimony).

In assessing a proffer of expert scientific testimony under F.R.E.Rule 702, the Court must also consider other applicable rules such as F.R.E.Rule 403, which "permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...'" *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. Because of the risk that expert evidence can be powerful and quite misleading, " 'the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Ibid.* (citing J. Weinstein, *Rule 702 of The Federal Rules of Evidence Is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

### B. *Analysis*

#### 1. *Qualification as an Expert*

Agent Fitzgerald is a member of the National Center for the Analysis of Violent Crimes ("NCAVC") unit of the FBI Academy in Quantico, VA. *See* Fitzgerald Curriculum Vitae ("Fitzgerald CV"), at 1. He has been in that unit for about five years. *Ibid.* As evident from the name of the group, the NCAVC's role is to aid in solving violent crime or violent crime-related matters. Hearing Tr. at 110. Agent Fitzgerald does not have a degree in linguistics, forensic stylistics, or text analysis; he has a bachelor's degree in criminal justice and a master's degree in criminal justice administration. *Ibid.* He has, however, among other things, attended threat assessment, psychotherapy assessment, and risk assessment seminars that have in-

volved matters related to the assessment of text, *id.* at 111–12, taught and conducted research in text analysis, *id.* at 115–19, analyzed text on a weekly or even daily basis during the course of his five years at NCAVC, *id.* at 113, and has worked on text analysis in a number of high profile matters including the Unabomber case. *Id.* at 121–27.

Defendant contends that Fitzgerald is not qualified as an expert because he only began receiving specialized training in forensic stylistics in 1998, that he has attended only three seminars in this area, and that he has only performed between ten and twelve document analyses to determine authorship. Defendant's Supplemental Memorandum in Opposition to the Proposed Expert Testimony Of James Fitzgerald, at 13.

■ As evidenced by testimony during the evidentiary hearing, however, since 1998, Fitzgerald has had rather extensive experience in text analysis, having observed and studied text for years. He arguably qualifies as an "observational" expert because he has examined so many examples over an extended period of time. *Cf. United States v. Hines*, 55 F.Supp.2d 62, 69 (D.Mass.1999). Because the expert need not have complete knowledge about the field in question, Fitzgerald qualifies as an expert in text analysis under the flexible requirements of *Daubert, Kumho,* and *Paoli II.*

Defendant is, of course, entitled to cross-examine Fitzgerald vigorously as to his expertise, or alleged lack thereof, and to his methods used to reach his conclusions. These issues more properly go to the credibility of Fitzgerald's testimony and the weight the jury should give it, rather than to its admissibility. *See Gisriel v. Uniroyal Inc.*, 517 F.2d 699, 702 (8th Cir.1975).

## 2. *Reliable Scientific Testimony Aiding the Jury*

Defendant also claims that the proffered expert testimony is subjective, unreliable, and lacks measurable standards. Unfortunately, no case law,[6] treatise, or law review article has dealt with this precise issue of whether the examination of text analysis to resolve a litigated question related to disputed authorship or meaning, or forensic stylistics, constitutes sufficiently reliable scientific evidence admissible in court.

Under the *Daubert* standard, one of the pertinent considerations in determining whether a theory or technique is scientific knowledge that will assist the trier of fact is whether the theory or technique has been subject to peer review and publication. Publication is but one element of peer review. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. Although it is not dispositive of admissibility, publication in a peer reviewed journal is relevant "in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Id.* at 594, 113 S.Ct. 2786.

---

**6.** The Court is aware of only three cases in which forensic stylistics has been addressed. In the first case, *United States v. Clifford*, 704 F.Supp. 86 (3d Cir.1983), the government did not proffer the testimony of its forensic linguistic expert acknowledging that at that time, forensic linguistic analysis was used only for investigative purposes because it was not a positive means of identification. In another case, *United States v. Salameh*, 54 F.Supp.2d 236 (S.D.N.Y.1999), the defendants sought new trials, arguing among other things, that the testimony of an expert on linguistic style would have been helpful to the defense; the court rejected that argument, concluding that such proposed testimony was "both immaterial and speculative and would not have been admitted into evidence." *Id.* at 251. The court did not further explain that conclusion. The third decision is an opinion by the California State Personnel Board, *In the Matter of the Appeal by Amarjit (Jack) Saluja*, No. 94–16 (May 2–3, 1994), which can be found at *www. spb.ca.gov/spblaw/pdsindx.htm*. In that case, the Board credited the expert testimony of Dr. Gerald McMenamin in finding that certain anonymous letters were written by an employee of the California Water Resources Control Board.

. The Government has cited to one publication[7] dealing with forensic stylistics—the McMenamin article.[8] That article explains:

> [L]inguistics is a well established scientific discipline with a long history of inquiry, and linguistic stylistics is the field within this discipline that studies variation in written language ... Stylistics is an applied science in two senses. It first requires an application of formal linguistic theory to empirical (fact-finding) linguistics, and second involves application of factual linguistics to the "applied" field of stylistics, thus fulfilling human purposes related to text description and interpretation or author identification.

McMenamin article, at 48. "To the extent that variation in written language can be measured, stylistics incorporates statistics." *Id.* at 50.[9] According to the McMenamin article, the results of stylistic analysis can be precise, coherent, and relatively complete; additionally, when objective stylistic analysis is restricted to demonstrable or measurable facts, it will produce reliable results. McMenamin article, at 48–49. The McMenamin article also notes that there is not one generally accepted technique of stylistic analysis; the decision depends largely on the data presented. *Id.* at 49. Furthermore, although there are those in the scientific community who

view the concept of style as defying analysis, "the scientific community overwhelmingly accepts that style is present in all written texts and that it can be observed, described, and analyzed." *Id.* at 50. Due, however, to the dearth of published cases or journals addressing forensic stylistics, the novelty of this field, and the fact that it has only been approved by law enforcement, the Court has no way of determining whether the McMenamin article is merely self-legitimized.[10]

Fitzgerald testified to the specific methodology he uses in determining authorship. First, he normally separates and catalogs the writings either chronologically or by victim. Hearing Tr. at 132. In this case, because there were handwritten and typewritten writings, he divided them into four categories: Known Typings ("KT"), Known Writings ("KW"), Questioned Typings ("QT"), and Questioned Writings ("QW"). *Ibid.* Then he read the twenty-two letters to obtain a sense for the "feel" of the writings. *Ibid.* Third, he color coded the issues contained in the writings into four categories: (1) punctuation and spelling; (2) threat; (3) interesting phrases; and (4) correct or incorrect "trip" phrases such as use of "there" or "their," use of "to," "two," or "too," and "your," or "you're." *Id.* at 133–34. Next, Fitzgerald created a chart and determined whether a particular word, abbreviation, or phrase

7. Although the Government also states that a chapter on forensic stylistics in included in a treatise by Cyril H. Hecht, entitled *Forensic Sciences,* it has not yet been able to obtain a copy of that treatise.

8. The same text has also been published in a book entitled *Forensic Stylistics.*

9. In *Clifford,* 704 F.2d at 90, the forensic expert, who the government did not call, relied on computer programs in order to identify similarities in writings. That is not the case here. Agent Fitzgerald has not relied on the use of any statistics.

10. The following quote from the McMenamin article does little to instill confidence in the reliability of the Agent's opinion as to authorship:

> There is strong practical and theoretical motivation to combine available methodologies in the analysis of style. From the researcher's perspective, the obligation to explain his or her method and findings leads to conclusions that are *"not so much objective as they are 'intersubjective.'"* (Ross 1973:3). With respect to the linguistic data itself, the study of stylistic variation mediates (in a relation of complementarity) between the non-measurable (qualitative) linguistic variables, which are the rules of language, and the measurable (quantifiable) frequencies of occurrence of units exemplifying the values of those linguistic variables (Itkonen 1980:363) (emphasis added).

McMenamin article, at 170.

was used correctly or was an idiosyncracy. *Id.* at 134. His results were reviewed by two other law enforcement officers. *Id.* at 114. No sources outside the FBI have reviewed his reports. *Id.* at 157.

Although Fitzgerald employed a particular methodology that may be subject to testing, neither Fitzgerald nor the Government has been able to identify a known rate of error, establish what amount of samples is necessary for an expert to be able to reach a conclusion as to probability of authorship, or pinpoint any meaningful peer review. Additionally, as Defendant argues, there is no universally recognized standard for certifying an individual as an expert in forensic stylistics.

Various judicial decisions regarding handwriting analysis, while not identical to text analysis, are instructive because handwriting analysis seems to suffer similar weakness in scientific reliability, namely the following: no known error rate, no professional or academic degrees in the field, no meaningful peer review, and no agreement as to how many exemplars are required to establish the probability of authorship. *See Hines*, 55 F.Supp.2d at 69; *United States v. Santillan*, 1999 WL 1201765, at *2 (N.D.Cal. Dec.3, 1999); *United States v. McVeigh*, 1997 WL 47724 (D.Colo.Trans. Feb. 5, 1997).

In *Hines*, the court permitted the government's handwriting expert to testify regarding the similarities and dissimilarities between the defendant's handwriting and handwriting on a robbery note, but did not allow the expert to testify to the identity of the defendant as the author of the robbery note. In so holding, the court recognized not only the lack of reliability of the handwriting expert testimony, e.g. no known rate of error or established standard, but also that the jury could easily evaluate on its own the similarities between the handwriting samples. The court noted, "[t]his is not rocket science, or higher math." *Hines*, 55 F.Supp.2d at 70. Nevertheless, the court was unwilling to disallow expert testimony altogether because the handwriting expert testimony

> involves more than just identifying what is similar and what is different in the same way a lay person would. It involves taking the next step—that this or that similarity matters, that it equals a general pattern. Presumably, the expert is helped in drawing general patterns by the numbers of exemplars she has seen, just like the spouse identifies the husband's handwriting because she has seen it numbers of times.

*Id.* at 70 n. 21. The court determined, however, that the expert's conclusion of authorship would be extraordinarily prejudicial. In its analysis, it noted that the court in *United States v. McVeigh*, 1997 WL 47724 (D.Colo.Trans. Feb. 5, 1997) was faced with a similar issue. In *McVeigh*, the court stated:

> "there is a great difference between a witness who has the requisite training and skill saying, 'Look, I've compared this handwriting on this exhibit with this exemplar and I've used the techniques of microscoping (sic) and, you know, all of those things that are often involved in that kind of comparison, and these are the things I find,' and 'I see these similarities and these dissimilarities and so forth' but does not go on to reach any sort of ultimate conclusion that this was written by the same person or expresses some probability or degree of confidence. The problem with … handwriting is that there is no testing of the—no verification-type testing of these opinion results; and in addition, there has never been within the discipline of people who practice this skill—there has never been any agreement on how to express the results. There is no standardized nomenclature, you know. Therefore, it seems to me that we should draw the distinction between somebody getting on the stand and saying 'Yeah, written by the same person,' or 'no, not written by the same person,' vs. 'these are the simi-

larities or these are the dissimilarities'; and the jury can decide."

*Id.* at 70 (citing *McVeigh*, 1997 WL 47724, at *4).

In accordance with *Hines* and *McVeigh*, the district court for the Northern District of California, also ruled that the handwriting expert's testimony as to the "specific mechanics and characteristics of handwriting" was admissible. *Santillan*, 1999 WL 1201765, at *5. The court was satisfied that such testimony would "add to the general knowledge of lay persons and assist them to make comparisons of different examples of handwriting." *Ibid.* Yet, just as in *Hines* and *McVeigh*, the court did not permit the expert to testify regarding his subjective opinion as to who penned the unknown writings because, among other things, no tests or studies of the accuracy of such an opinion had yet been conducted. *Ibid.; but see United States v. Paul*, 175 F.3d 906, 911 (11th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 535, 145 L.Ed.2d 415 (1999) (permitting handwriting expert to identify points of comparison between two writings and conclude that defendant was the author of both, but noting that jury was free to conduct own comparison and reach own conclusion regarding authorship of the unknown writing).

### i. *Fitzgerald's Opinion on Authorship of Writings*

The Court agrees with the rationale and approaches utilized in *Hines*, *McVeigh*, and *Santillan*. The reliability of text analysis, much like handwriting analysis, is questionable because, as discussed *supra*, there is no known rate of error, no recognized standard, no meaningful peer review, and no system of accrediting an individual as an expert in the field. Consequently, the existing data for forensic stylistics cannot definitively establish, as can DNA data, that a particular person is "the" author of a particular writing. *Cf. Hines*, 55 F.Supp.2d at 69. The Government has even conceded that while it disagrees with the results of the decision in *Hines*,

*McVeigh*, and *Santillan*, the more cautious approach adopted by those courts may be appropriate given the lack of prior judicial approval of this area of expertise.

■ Because of the lack of scientific reliability of forensic stylistics, the Court is not satisfied that the jury would benefit from Fitzgerald's testimony as to his subjective opinion that the questioned writings were written by the same individual and that that individual is Defendant Roy Van Wyk. Moreover, the fact that such a conclusion comes from an "expert" may place more weight and credence on Fitzgerald's opinion than is warranted. Acknowledging Fitzgerald's opinion as that of an expert and FBI agent invests the opinion with an objectivity that this methodology does not support. In weighing its prejudicial effect compared to its probative value, exclusion is warranted. Because the opinion testimony is substantially more prejudicial than it would be probative, it should be excluded under F.R.E. Rule 403. Therefore, Agent Fitzgerald is not permitted to testify to his conclusion as to the identity of the author of the unknown writings.

### ii. *Internal Evidence Testimony*

As the Government states, there can be no question that evidence of the known writings and unknown writings is admissible; courts uniformly have admitted evidence of known writings, recognizing that the particular or peculiar use of grammar and spelling, for example, can be observed and identified to establish authorship. *See Clifford*, 704 F.2d 86 (reversing trial court's decision and permitting evidence of the defendant's correspondence to show stylistic similarities between the correspondence known to belong to the defendant and the threatening letters, in order to show that defendant authored the threatening letters); *United States v. Campbell*, 732 F.2d 1017 (1st Cir.1984) (noting that misspelling a common word can be so much of a testimonial message that defendant's Fifth Amendment rights

against self incrimination are triggered); *United States v. Pheaster*, 544 F.2d 353, 372 (9th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) ("The manner of spelling a word is no less an identifying characteristic than the manner of crossing a 't' or looping an 'o'. All may tend to identify a defendant as the author of a writing without involving the content or message of what is written"); *United States v. Matos*, 990 F.Supp. 141, 144 (E.D.N.Y.1998) (holding Fifth Amendment privilege applies because requiring someone to state how he spells a word "may well serve to identify the person as the perpetrator of a crime.")

■ The question here is whether the Court may properly allow Agent Fitzgerald to testify as an expert regarding the comparisons of markers between the known writings and questioned writings.[11] Defendant argues that Agent Fitzgerald's expert testimony will not be helpful in assisting the trier of fact. He argues that comparisons between the known and questioned writings could easily be drawn by the jurors and that such expert testimony would only overwhelm, confuse or mislead the jury. Unlike his opinion on authorship, Fitzgerald's expertise in text analysis can be helpful to the jury by facilitating the comparison of the documents, making distinctions, and sharing his experience as to how common or unique a particular "marker" or pattern is. *See Hines*, 55 F.Supp.2d at 69. Therefore, the Court is satisfied that Fitzgerald's testimony as to the specific similarities and idiosyncracies between the known writings and questioned writings, as well as testimony regarding, for example, how frequently or infrequently in his experience, he has seen a particular idiosyncrasy, will aid the jury in determining the authorship of the unknown writings. The internal evidence related to the "four corners" of the writings is admissible.

### iii. *External Evidence Testimony*

■ Finally, Defendant objects that Agent Fitzgerald draws his conclusion not only from documents submitted to him, but also on "a review of the history of Van Wyk and the victimology of the four women who were recipients of one or more of these documents." Fitzgerald report, at 15. That is, Defendant claims the proposed expert's opinion relies on "external" and background information, the sum of which is to cast Defendant as a "terrorizer" of women, or as a "very bad" person. Fitzgerald in effect states that Van Wyk is the author because he is the aggressor, whereas the issue is whether he is the aggressor because he is the author. The Court agrees with Defendant and finds that such external factors are actually "disguised" propensity evidence, which is prohibited by F.R.E. Rule 404(b). Accordingly, Fitzgerald's testimony regarding these external or extratextual factors is barred. The jury has already heard that evidence. For Fitzgerald to repeat it as an expert is highly prejudicial and F.R.E. Rule 403 also precludes it.

### III. *Conclusion*

For the foregoing reasons, Defendant's motion *in limine* to exclude Fitzgerald's testimony is **granted in part;** Fitzgerald's expert testimony is limited to the comparison of characteristics or "markers" between writings known to have been authored by Defendant and the writings in which authorship is "questioned" or unknown. Fitzgerald's testimony regarding any "external" or extrinsic factors is barred as is his conclusion regarding the identity of the author of the "questioned" writings.

An appropriate Order follows.

### ORDER

This matter having come before the Court on Defendant's *in limine* motion to

---

**11.** During the evidentiary hearing on February 3, 2000, defense counsel conceded that he would have no objection to Agent Fitzgerald testifying about the internal evidence. Hearing Tr. at 189. The next day, however, counsel for Defendant changed his position by withdrawing this concession.

exclude the proposed expert testimony of FBI Special Agent James R. Fitzgerald; and

The Court having considered the submissions of the parties; and

The Court having heard oral argument from the parties on February 3, 2000 and February 4, 2000; and

For the reasons set forth in the Court's Opinion issued this day; and

For good cause shown;

It is on this the 5th day of February, 2000 hereby ORDERED that Defendant's motion *in limine* is **granted in part and denied in part;** and

IT IS FURTHER ORDERED that Agent Fitzgerald may testify to the comparison of characteristics or "markers" between the handwritten and typed writings, of which Defendant is known to be the author, and the handwritten and typed writings, of which authorship is "questioned" or unknown; and

IT IS FURTHER ORDERED that Fitzgerald's testimony regarding any "external" or extrinsic factors and his conclusion as to the author of the "questioned" writings are barred.