**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Phillip Steven JONES, Defendant–**
**Appellant.**

No. 95–1593.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 1, 1996.

Decided Dec. 17, 1996.

Kathleen Moro Nesi, Asst. U.S. Attorney, argued and briefed, Office of the U.S. Attorney, Detroit, MI, for Plaintiff–Appellee.

Robert J. Dunn, argued and briefed, Midland, MI, for Defendant–Appellant.

Before: KRUPANSKY, BOGGS, and SILER, Circuit Judges.

SILER, Circuit Judge.

Defendant, Phillip Jones, appeals his sentence and conviction for conspiracy to possess with intent to distribute cocaine base, distribution of cocaine base, attempt to possess cocaine with intent to distribute and use of a firearm during a drug trafficking crime. He argues that the evidence is insufficient to support his convictions for conspiracy, attempt and use of a firearm. He further contends that the district court erred in not awarding him a downward departure or granting him a dismissal for sentencing entrapment and in holding him responsible for 2.2 kilograms of cocaine.

## I. Facts

Jones and his co-conspirator cousin, Alibere Herring, were indicted for various gun and drug-related offenses. Jones was convicted under counts one, three, four and five involving: conspiracy to possess with intent to distribute and, to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1) [count one]; distribution of cocaine base and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) [count three]; attempt to possess with intent to distribute cocaine and aiding and abetting in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2 [count four]; and use and carrying of firearms during and in relation to a drug trafficking crime and aiding and abetting in violation of 18 U.S.C. §§ 2 and 924(c) [count five]. The district court sentenced Jones to concurrent terms of 120 months each on counts one, three, and four and a consecutive term of thirty years on count five.

The case against Jones arose as part of a larger investigation that focused on high-level cocaine and heroin suppliers in the Detroit metropolitan area. This investigation began in early 1992 and eventually uncovered a suspect who was dealing drugs within the Michigan state prison system. The suspect began cooperating as an informant. In June 1993, the informant told Agent Richard Crock of the Drug Enforcement Administration ("DEA") that Jones, then a prison inmate, had approached him and expressed an interest in purchasing narcotics once he was discharged from prison.

Subsequently, Jones was released from prison and, on June 13, 1993, undercover DEA Agent Crock, posing as a large-scale drug trafficker, received a phone call from Jones who expressed a desire to meet with Crock. On June 21, 1993, Jones again contacted Crock and expressed a desire to meet with him to purchase cocaine. Crock then arranged a meeting with defendant Jones in an apartment rented by undercover agents.

The meeting took place on June 23, 1993, in Detroit. Agent Crock and Agent Joseph Peterson, both undercover, were present at the meeting. Jones explained that he had just been released from prison two weeks before [1] and that he wanted to return to the cocaine business. He stated that he had four individuals who wanted to purchase three kilograms of cocaine each, but that he needed help in getting reestablished in the cocaine business because of his prior incarceration. He explained that he was currently in business with Herring, and he informed the agents that he had already established eight operational cocaine houses. The agents explained that they dealt in large quantities of cocaine and that the current price was at least $23,000 per kilogram. Jones indicated that he could come up with between $15,000 and $20,000 in twenty-four hours.

On June 29, 1993, undercover DEA agents met with Jones and Herring to view their distribution houses. The group then proceeded on a site-by-site tour of seven houses. The first stop was a duplex described by Jones as one of his biggest money makers. Inside, the agents observed what appeared to be packaging for crack cocaine. Next door was another one of the houses. Inside, Herring displayed a folding stock AK–47 with a banana clip. Herring indicated that this gun was for protection, and Jones stated that they had three more AK–47s and other weapons at other locations. The group then travelled to the various other sites, including "Reggie's Deli," owned by Reggie Guynes, where Jones explained that money could be laundered and deals could be negotiated. Guynes's residence was also offered as a location where deals could be made and drugs stored. Once the tour was complete, Jones informed the agents that the houses represented the west side of his organization and that he hoped to expand to the east side once he obtained more narcotics.

Various discussions and negotiations then took place between Jones, Herring and the agents over the next several weeks. It was decided that Herring and Jones would sell the agents a quantity of cocaine. The agents insisted on this transaction so that Herring and Jones could prove that they were not

---

1. Jones had been incarcerated for two and one-half years for possession with intent to deliver cocaine.

working for the police. The transaction took place on September 29, 1993, at Reggie's Deli when an undercover agent paid Herring $425 for 12.2 grams of crack cocaine. The agent asked where Jones was and Herring responded that he had just left to get something to eat.[2]

Subsequently, Jones called the agents on several occasions to negotiate a price and to inquire when he could begin receiving cocaine. On November 3, 1993, Agent Crock contacted Jones to advise him that the cocaine would be available in seven to ten days. Crock also offered to accept guns in partial payment of, or as collateral for, the cocaine. Jones indicated that he could possibly make available AR–15s, M–16s and AK–47s.

On November 11 and 12, Jones engaged in telephonic negotiations regarding the number of kilograms of cocaine that he was interested in purchasing. He also indicated that he had located a Mac-10 machine gun. Later, on November 17, 1993, Jones called and indicated that he was ready to proceed with the exchange. That same day, Jones, Herring, Crock and other undercover agents met at the undercover apartment where they negotiated the exchange of cocaine for firearms and money. Jones and Herring informed the agents that they had the weapons in their vehicle for inspection.

The group then proceeded outside to a car, where they met Devon McMillan, an associate of Jones. Herring opened the trunk and displayed four weapons: a Cobray Mac–11, 9mm fully automatic machine gun with twenty-one live rounds; an Ingram Mac–10, 9mm with twenty-one live rounds; a Smith and Wesson .357 Magnum revolver with five live rounds; and a Cline's AK–47 assault rifle with seven live rounds. Two of the guns had been altered so as to obliterate their serial numbers. Once Crock observed the weapons, the agents arrested Jones, Herring and McMillan.

## II. Sufficiency of the Evidence

■ A Rule 29 motion is a challenge to the sufficiency of the evidence. "[W]hen the

sufficiency of the evidence is challenged on appeal, the standard of review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime....' " *United States v. Swidan,* 888 F.2d 1076, 1080 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)(emphasis in original)). On review, this court "may conclude a conviction is supported by sufficient evidence even though the circumstantial evidence does not 'remove every reasonable hypothesis except that of guilt.' " *United States v. Clark,* 928 F.2d 733, 736 (6th Cir.) (per curiam) (quoting *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984), *cert. denied,* 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990)), *cert. denied,* 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991) and 502 U.S. 885, 112 S.Ct. 240, 116 L.Ed.2d 195 (1991).

### A. Count One: Drug Conspiracy Conviction

■ Jones argues that the evidence is insufficient to prove that he was involved in a drug conspiracy with Herring and that no rational jury could arrive at such a conclusion. He opines that he was nothing more than a "big talker" with no ability, desire or capital to support his puffing. He notes that he was not present for the only sale of cocaine from Herring to the DEA, and any time he was with Herring, it was just as a "tag-along." Also, he asserts that, because the agents observed no cocaine, the tour of the alleged drug houses proved nothing. Finally, Jones indicates that the gun exchange was the DEA's idea, and he claims that he played no part in the production of the guns.

Jones's argument is untenable. From the facts, there is ample evidence that could support a conspiracy conviction. Obviously, it would be expected that Jones would have no money and that his drug ring would not already be operational, for he had just been released from prison. Moreover, contrary to

---

**2.** DEA surveillance confirmed that Jones arrived at Reggie's Deli with Herring and then left three minutes later and went across the street to a restaurant. Jones returned just after the cocaine sale.

Jones's assertions, he initiated much of the contact with the undercover agents. Also, he explained that he was working with Herring and that, together, they had customers and cocaine houses established to move the cocaine.

Furthermore, Jones arranged for and then escorted the agents on a visit to seven drug houses that he had established. During the tour, both Jones and Herring were actively involved. Herring showed the agents the AK–47, and Jones stated that they had three more. Jones also discussed the various uses to which the houses could be put, and he expressed his desire to expand to the east side.

Thus, there is much evidence in the record supporting the conclusion that Jones and Herring were working together in a conspiracy to set up a large-scale drug operation. Viewing all of the evidence in the light most favorable to the government, it is clear that there was sufficient evidence to support Jones's conviction.

## B.  Count Four:  Attempt to Possess with Intent to Distribute Cocaine

■ Jones also contests his conviction for attempting to possess with the intent to distribute cocaine.  He notes that he never bought any drugs and that agents knowledgeable in the local drug trade had never heard of him.  Again, Jones asserts that he was a mere "tag-along" to Herring.  Furthermore, he argues that the agents initiated the drug deal and that he was only there as a disinterested bystander.

The evidence, however, proves otherwise. Throughout the conspiracy, Jones initiated many of the phone calls with the agents, wanting to know when he could begin receiving cocaine.  The negotiations finally culminated in the transaction at the undercover apartment where Jones, Herring and the agents were to exchange guns for drugs. Contrary to Jones's bystander argument, the government proved that he was sitting closest to the agents, leaning forward and actively participating in the conversations.  Furthermore, Jones initially met alone with Crock and assured him that he had the guns in the trunk of the car.  Before viewing the

weapons, negotiations took place and Jones explained that this initial purchase would "open the door for everything" and thus lead to future sales.

Viewing the evidence in the light most favorable to the government, a reasonable jury certainly could infer that Jones had an active role in the transaction.  Thus, there was sufficient evidence to support Jones's conviction on this count.

## C.  Count Five:  Use of Firearm During Drug Trafficking Crime

Next, Jones contends that the evidence does not support his conviction for use and carrying of firearms during and in relation to a drug trafficking crime and aiding and abetting in violation of 18 U.S.C. §§ 2 and 924(c). The conviction arose out of the aforementioned exchange of weapons for cocaine.

■ Again, Jones argues that he was only passively involved in the transaction and that it was Herring who was primarily responsible for the attempted exchange.  However, the evidence, as described above, shows that he actively participated in the negotiations and that he informed the agents that the guns were present to be viewed.  The evidence of record is clearly sufficient for the jury to have found that Jones had an active role.

■ Jones also alleges that the district court never charged the jury on the aiding and abetting aspect of count five.  He admits, however, that an aiding and abetting instruction was given on other counts and that the jury could have reasonably inferred that this charge applied to count five as well. In fact, in charging the jury, the district court specifically stated that aiding and abetting was a part of the offense in count five. Furthermore, the court indicated that it had previously instructed the jury with respect to count two, which included an aiding and abetting instruction, and that the jury should "[a]pply those same standards to Count[ ] Five." Thus, the jury instructions were proper and a rational jury could have convicted Jones on count five.

■ Next, Jones argues that he cannot be convicted under 18 U.S.C. § 924(c) because the underlying felony he was charged with was "an attempt felony and is not punishable under the controlled substance act but under the attempt statute." Count four charged Jones with a violation of 21 U.S.C. §§ 841(a)(1) and 846. This is a felony punishable under the controlled substance act. Thus, Jones's argument lacks merit.

■ Finally, he argues that the use of the firearms was not "in furtherance" of the attempt crime. However, the Supreme Court has held that a "criminal who trades his firearm for drugs 'uses' it during and in relation to a drug trafficking offense within the meaning of § 924(c)(1)." *Smith v. United States,* 508 U.S. 223, 241, 113 S.Ct. 2050, 2060, 124 L.Ed.2d 138 (1993). Because the attempt offense is a drug-related felony, Jones used the firearms "during or in relation to" the drug trafficking offense.

### III. Sentencing Entrapment

■ Next, Jones argues that the district court erred in not awarding him a downward departure or granting him a dismissal for sentencing entrapment. He argues that the police already knew that they were going to arrest him and that they only insisted upon a weapons exchange in order to enhance his crime. He asserts that the weapons were the DEA's idea, that they insisted upon them, and that they had no legitimate law enforcement reason in instigating the weapons exchange.

While other circuits have recognized sentencing entrapment, this circuit has never acknowledged sentencing entrapment as a valid basis for a downward departure under the guidelines. *See United States v. Wright,* 48 F.3d 1220 (Table), 1995 WL 101300 (6th Cir. March 9, 1995); *United States v. Murphy,* 16 F.3d 1222 (Table), 1994 WL 18008 (6th Cir. Jan. 21, 1994). Moreover, no circuit has ever found sentencing entrapment to be grounds for a dismissal. *Wright,* 1995 WL 101300, at *2. The district court, without ruling on whether sentencing entrapment is a valid ground for departure, held that Jones nonetheless failed to demonstrate facts amounting to sentencing entrapment:

I do find none of the factors you have suggested apply here, even assuming that the Sixth Circuit were to adopt the sentencing entrapment doctrine which you've presented from elsewhere. I don't think it would be applicable to this case.

It was the defendant and his co-conspirator who made it apparent to the agents that they have the fire power to protect themselves as very substantial drug dealers.

This entire tour of his purported drug houses was for the defendant to claim he was capable of setting up houses all around the city and could handle very large quantities of drugs. I see no entrapment here.

. . . .

I don't find any sentencing entrapment. The guns, I think, were introduced by the defendant and his co-conspirator and it was a natural response, of course, for the agents to attempt to draw out whatever this fire power was they were claiming that they had.

Here, the district court clearly found facts in the record that militated against a downward departure. Having done so, it "implicitly acknowledge[d] discretion to depart from the Guidelines." *United States v. Jennings,* 83 F.3d 145, 153 (6th Cir.), *cert. denied, Stepp v. United States,* — U.S. —, 117 S.Ct. 411, 136 L.Ed.2d 324 (1996). Therefore, "the District Court's failure to depart downward in light of 'sentencing entrapment' is unappealable." *Id.* Thus, Jones has no appeal on this ground.

While this circuit has never granted a downward departure premised on sentencing entrapment, we need not address whether this circuit should adopt the defense. The district court determined that the facts of this case were insufficient to raise the defense as it is defined by other circuits. As stated above, this finding is unappealable.

### IV. Quantity of Drugs

■ A district court's decision as to the amount of drugs chargeable to a defendant is a finding of fact that must be accepted unless clearly erroneous. *United States v. Walton,* 908 F.2d 1289, 1300–01 (6th Cir.), *cert. de-*

809

**810**

*nied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990). Appellants who challenge the district court's determination "face a difficult burden." *Id.*

Jones argues that the district court erred in calculating the quantity of drugs for which he was responsible. He admits responsibility for the 1.2 kilograms of cocaine equivalent resulting from Herring's sale to the DEA on September 29.[3] However, he argues that he should not be held responsible for any of the cocaine involved in the November 17 attempted exchange. Again, Jones uses the argument that he was a mere "tag-along" or "bystander" and thus should not be responsible for the cocaine that was to be exchanged.

The district court, however, found that it was reasonable to hold Jones responsible for 2.2 kilograms of cocaine. This was a conservative number and was much lower than the five to thirteen kilograms that the presentence investigative report suggested. The district court, after listening to Jones's arguments, stated:

> I do find I have examined all of the facts of record, I've examined your law, your arguments and I do find that he reasonably foresaw under the circumstances addressed at this trial, no more than 2.2 kilograms
>
> . . . .
>
> Now in the long run, he probably hoped to do up to 12, he was going to be fronted this with the credit for the guns.
>
> But the reasonable foreseeability of this, the activity with which this indictment stopped was 2.2 kilograms
>
> . . . .

This finding is based upon the facts. Jones was convicted of count four of attempt to possess with intent to distribute the bargained-for one kilogram of cocaine. The jury clearly rejected the "tag-along" theory that Jones espouses. As such, it was reasonable to hold him accountable for the one kilogram. This, in addition to the prior sale by Herring, equals 2.2 kilograms. It cannot be said that

the district court's decision was clearly erroneous.

AFFIRMED.

---

**3.** The September 29 sale was actually for 12.2 grams of crack cocaine. However, pursuant to USSG § 2D1.1, 12.2 grams of crack cocaine is roughly equivalent to 1.2 kilograms of cocaine.