NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0663n.06

Nos. 07-6493, 08-5315, 08-5422

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Sep 28, 2009**

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| CONNIE JERMAINE YOUNG, (07-6493) | ) DISTRICT OF TENNESSEE |
| TERRY L. DAWKINS, (08-5315) | ) |
| ELISA GROOMS, (08-5422) | ) O P I N I O N |
| | ) |
| Defendants-Appellants. | ) |
| | ) |

BEFORE:  McKEAGUE and WHITE, Circuit Judges; MARBLEY, District Judge.[*]

**McKeague, Circuit Judge.**  Fourteen defendants were indicted on a conspiracy to distribute cocaine and cocaine base.  Many of the defendants pleaded guilty, while three–Connie Jermaine Young, Terry Dawkins, and Elisa Grooms–pleaded not guilty and went to trial.  All three were found guilty and, in this consolidated appeal, they now allege a number of errors including prosecutorial misconduct, insufficiency of the evidence, and the inadmissibility of a variety of evidence and testimony at trial.  For the reasons given below, we affirm.

**I.**

---

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

The general shape of the conspiracy, as established through the proofs at trial, was as follows. Rickey Story spearheaded a conspiracy to sell significant amounts of cocaine and cocaine base in the Eastern District of Tennessee. The conspiracy ultimately involved fourteen people, eleven of whom pleaded guilty. Story would receive the drugs from two sources: a source called "Carlos," who was never apprehended, and a source in South Carolina. Evidence at trial indicated that Young was the source in South Carolina. Story would go to South Carolina several times a week, accompanied by Dawkins. They would return with nine to eighteen ounces of cocaine at a time. They would then cook some of the cocaine into crack cocaine. Story would then give powder cocaine and crack cocaine to Dawkins, Grooms, Timothy Collins and multiple others to sell in and around eastern Tennessee.

Story had relationships with several women involved in the conspiracy. He was married to Amy Leonard, and he dated both Debra Demery and Grooms. Story also had a child with Grooms. All three women were involved in the conspiracy.[1] Leonard and Demery testified at trial regarding the conspiracy.

## A. The Investigation

Based on information from Troy Hunt, a confidential informant, a Drug Enforcement Agency ("DEA") task force began investigating Rickey Story in October 2005. Members of the task force recorded a call between Hunt and Story on October 13, 2005. On the call, Story agreed to sell Hunt a half an ounce of crack cocaine and told Hunt to pick up the crack at Story's house.

---

[1]Leonard and Demery pled guilty, while a jury found Grooms guilty.

Agents sent Hunt to Story's house with money for the purchase. Hunt wore a wire to record his conversations with Story. Story was not there when Hunt arrived, so the agents had Hunt set up an alternate meeting. At that meeting, Story sold Hunt crack cocaine. The agents observed Story leaving the meeting in a car with one other person. Hunt identified the passenger as Terry Dawkins.

In November 2005, DEA agents asked Hunt to purchase a full ounce of cocaine from Story. Story agreed to make the sale. Hunt again wore a wire. The agents heard Story tell Hunt to meet him at a Sonic Drive-In. The agents parked about a hundred yards away from the Sonic to observe. Shortly after the call, a brown Chevrolet pulled into the Sonic and a black man wearing a hat got out of the car. The man told Hunt that he had been sent to make the sale. The man gave Hunt crack cocaine, and Hunt left.

Based on the two purchases, the agents received a Title III wiretap order for Story's cell phone. The order began in February 2006, and it allowed the agents to tap Story's phone for thirty days. After thirty days, the agents sought an extension to the wiretap order. The district court granted an extension, and it expanded the original order to allow agents to intercept text messages.

Using information from the wiretap, agents were able to identify others involved with Story in selling cocaine, including Connie Young, Terry Dawkins, and Elisa Grooms. A grand jury issued an indictment for Story and unnamed others for conspiracy to distribute five kilograms of cocaine. A superseding indictment later included Dawkins, Young, Grooms, Collins, Demery, Leonard, and others.

**B. Evidence at Trial**

 **1. Young**

The evidence against Young consisted primarily of Story's testimony and information gleaned from the wiretap. Story identified Young as Dawkins's source for cocaine in South Carolina. Though he was never introduced to Young, he spoke with him once or twice. Story also indicated that Dawkins would go to Young's house to get the cocaine.

David Chambers, a member of the DEA task force, testified that the task force linked the voices on the wiretap to names by retrieving the subscriber information for the numbers calling Story. Chambers testified that he was able to link names to voices by context. For instance, after a call, Story would make another call and say, "I just got done talking to Terry." Chambers also indicated that the task force would subpoena phone companies to provide subscriber information for numbers that called or were called from Story's phone. The task force would then retrieve the criminal history for each of those callers.

On the recorded calls, Story only spoke to Young one time. However, Chambers testified that Dawkins and Young spoke on the phone four or five times. Story identified Dawkins and Young talking about drugs on several of the recorded calls and making plans to meet in South Carolina. Story also indicated that, in one of the recorded calls, Dawkins told him that Young was going to front Dawkins seven ounces of cocaine. Story also noted that, in another call, Dawkins referred to Jeremy and that Jeremy meant Young.

Chambers acknowledged that he himself did not have a basis to identify Young's voice. When pressed on how he identified Young, Chambers indicated that Story had identified Young. Chambers also indicated that he relied on "other factors that corroborated that – what he told me, the phone call I listened to, and Mr. Young's criminal history."

After Chambers mentioned Young's criminal history, Young's lawyer requested a mistrial. The district court denied Young's motion but offered Young's attorney a limiting instruction. After conferring with his client, the attorney declined the instruction. Young's attorney renewed his motion for a mistrial at the end of the government's case. The motion was again denied.

## 2. Dawkins

At trial, Chambers identified Dawkins as the man at the November 2005 buy. Chambers admitted that he told the grand jury that the man at that buy was tall but that Dawkins was short. He noted that Dawkins was on an embankment at the time Chambers observed him. Hunt testified that Dawkins sold him crack cocaine in the November 2005 buy that Chambers witnessed. Similarly, Story testified that Dawkins had accompanied him on the October buy and that he had sent Dawkins to sell to Hunt in November.

Testimony established that Dawkins was intimately involved in Story's drug sales. Two witnesses described Dawkins as Story's right-hand man. One witness testified that Dawkins would help Story cook the cocaine and distribute it. Timothy Collins, who lived with Story for a time, testified that Dawkins would make daily cocaine deliveries on Story's behalf.

Testimony also linked Dawkins to Story's supplier. Story testified that, in 2005 and 2006, he would go to South Carolina several times a week with Dawkins to acquire cocaine. Another witness testified that he heard Dawkins and Story talk about how they would go to South Carolina to acquire cocaine. Collins indicated that Dawkins provided the contact in South Carolina through which Story and Dawkins acquired cocaine. Collins also testified that Dawkins and Story would

bring back four or five ounces of cocaine from South Carolina once or twice a week. Collins accompanied Story and Dawkins on one of the trips.

Amy Leonard, another defendant and Story's wife, testified that Story sometimes received his supply of crack cocaine from Dawkins. She initially testified that Dawkins would get the cocaine from North Carolina, but the government inquired if she meant North Carolina or South Carolina. Dawkins's attorney objected to the leading question, and the district court sustained the objection. The government then inquired, "Do you know if it's North Carolina or South Carolina?" Leonard replied that she meant South Carolina.

Leonard also testified that Dawkins and Story would talk about trips to South Carolina, that Story would tell her about the trips to South Carolina, and that they would bring two or three ounces of cocaine back from each trip to South Carolina. Leonard testified that she often saw Dawkins use Story's phone to arrange sales. Collins also identified Dawkins voice on one of the recorded calls, and, stated that, on that call, Dawkins and Story were talking about collecting money.

### 3. Grooms

The evidence against Grooms included testimony from several witnesses as well as intercepted text messages and phone calls. Deborah Demery testified that Grooms was the mother of Story's child and his ex-girlfriend. Demery had several conversations with Grooms about cocaine and other drugs after 2005. She also overheard telephone conversations between Story and Grooms regarding drugs.

Collins, who lived with Story and Grooms for a period of time beginning in 2005, indicated that Grooms would give drugs to customers who came by the house while Story was away. This

occurred every day. Collins testified that Grooms continued to help Story even after Grooms moved out of Story's house. He indicated that he delivered marijuana to Grooms once after she moved.

Story testified that Grooms helped him sell crack and marijuana. He testified that she continued selling crack and marijuana for him after she moved out in 2005. In one of the recorded calls, Grooms told Story about money she had collected from selling marijuana. He also identified several text messages the DEA had intercepted, and he indicated that, in them, Grooms had referenced selling crack for Story. Story described Grooms as a distributor.

Brian Rogers testified that he frequently purchased crack cocaine from Story and that Grooms was frequently with Story when Rogers made his purchases. He also testified that, on one occasion, Grooms sold him crack cocaine.

Grooms took the stand to testify in her defense. She testified that she never sold drugs for Story while she lived with him. She admitted selling marijuana for him once she moved out. She testified that all of the text messages referred to marijuana.

Grooms made a motion for acquittal, challenging the government's use of evidence that she had been involved in drug distribution before she turned eighteen. She argued that, without that evidence, the evidence of her involvement in the conspiracy was insufficient. The district court denied the motion.

## C. Closing Arguments, Verdict, and Sentencing

During closing arguments, the defense attorney attacked Story's character and credibility. During the prosecutor's closing argument, the prosecutor responded to this line of attack by stating that

> You may not like Rickey Story. I don't like Rickey Story. He's not a nice person. He's a drug dealer. He's apparently fond of white females. He's been dealing drugs since he was in his teens, since 1994. . . . And you may not like Rickey Story. He's the one who's got the best information about how this operation worked. You can corroborate a lot of his testimony based on other codefendants' testimony . . . .

(J.A. at 698-99.)

The jury found Dawkins guilty of four counts of conspiracy: conspiracy to distribute five kilograms or more of cocaine, conspiracy to distribute fifty grams or more of cocaine base, and two counts of conspiracy to distribute five grams or more of cocaine base. The jury found Young guilty of conspiracy to distribute five kilograms or more of cocaine. The jury found Grooms guilty of a conspiracy to distribute five grams or more, but less than fifty grams, of cocaine base.

Prior to trial, the government filed a notice that it intended to introduce Young's prior felony convictions at sentencing. With Young's prior convictions, he would receive mandatory life in prison. Young filed a sentencing memorandum contesting the use of the prior convictions. At sentencing, Young's attorney indicated that Young was confused about the effect of his prior convictions. After conferring with Young, Young's attorney indicated that Young wanted to be sentenced and would not contest his prior convictions. Young received life in prison.

## II.

### A. Young

Young raises four issues on appeal: sufficiency of the evidence, the denial of his motion for a mistrial, the notice he received regarding the potential for a mandatory life sentence, and the use of a conviction he received while under the age of eighteen as a prior felony drug offense in

establishing the basis for a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A). We address

each issue in turn.

### 1. Sufficiency of the Evidence

When reviewing a defendant's challenge to the sufficiency of the evidence, a court must

determine "whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime." *United States v. Jones*,

102 F.3d 804, 807 (6th Cir. 1996). The credibility, or lack thereof, of the witnesses for the

prosecution is not a ground for challenging the sufficiency of the evidence. *United States v. Paige*,

470 F.3d 603, 608 (6th Cir. 2006). Young did not make a motion for an acquittal at any point during

the trial. Therefore, the court should "reverse his conviction only if the record is 'devoid of evidence

pointing to guilt,' such that a manifest miscarriage of justice occurred." *United States v. Vasquez*,

560 F.3d 461, 469 (6th Cir. 2009).

Young was convicted of conspiracy to distribute five kilograms or more of cocaine. A

conspiracy to distribute drugs requires "(1) an agreement to violate the drug laws, and (2) each

conspirator's knowledge of, intent to join, and participation in the conspiracy." *United States v.

Crozier*, 259 F.3d 503, 517 (6th Cir. 2001). A conspiracy can be inferred from evidence of repeat

purchases and from the amount of drugs involved. *United States v. Martinez*, 430 F.3d 317, 333 (6th

Cir. 2005).

The record is not devoid of evidence against Young. Story identified Young as his source

for cocaine in South Carolina. Story testified that they would get drugs from Young "three or four

times a week" and that they would get "9 ounces to 18 ounces." Further, Young's voice was

identified on several phone calls discussing arrangements for drug purchases. To the extent that Young argues there should be more evidence against him or that Story was not a credible witness, he does not raise issues that are cognizable in this sufficiency challenge. So long as there was some evidence supporting the conviction, we cannot find that it was a manifest miscarriage of justice.

### 2. Motion for a Mistrial

Young asserts that the district court erred in denying his motion for a mistrial based on Chambers's reference to Young's criminal history. A denial of a motion for a mistrial is reviewed for an abuse of discretion. *United States v. Wimbley*, 553 F.3d 455, 460 (6th Cir. 2009).

The comment in question occurred during Young's cross-examination of Chambers. Chambers testified on direct examination that part of the wiretap process was to retrieve the criminal history from phone numbers that called the tapped phone. Chambers testified that he was able to identify Story's voice on the calls. When the government asked if Chambers could identify any other voices he stated that he could identify "Terry Dawkins, Elisa Grooms. A person I believe to be Connie Young. . . ." On cross-examination, Young's attorney asked what basis Chambers had to identify Young's voice. Chambers admitted that he had not spoken with Young but that Story had identified Young's voice. When Young's attorney asked "You're going on what Rickey Story has told you?", Chambers replied "Well, I mean there's other factors that corroborated that–what he told me, the phone call I listened to, and Mr. Young's criminal history." Young's attorney asked, "I'm sorry you said what?" Chambers replied "His criminal history."

We use a five factor test for assessing whether a reference to an unrelated arrest requires a mistrial: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning

was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether

any bad faith was evidenced by the government, and (5) whether the remark was only a small part

of the evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003). The

comment in question came during cross-examination rather than on the government's direct

examination. While the five-factor framework is therefore not directly on point, we find it provides

appropriate guidance in assessing Chambers's comment. Further, based on these factors,

Chambers's isolated comment did not warrant a mistrial. The government did not solicit

Chambers's remark. Instead, Young's attorney solicited it. The government was not engaged in an

unreasonable line of questioning. Indeed, the defense attorney should have been aware that

Chambers might reference Young's criminal history as Chambers indicated earlier that "one of the

ways that they identify these people is through reference, among other things, to their criminal

history." Though the district court offered a limiting instruction, Young declined the instruction.[1]

There was no evidence of bad faith by the government. Finally, the remark was only a small part

of the evidence against Young. Taking these factors together, the district court did not abuse its

discretion in denying Young's motion for a mistrial. *Compare United States v. Forrest*, 17 F.3d 916,

920 (6th Cir. 1994) (per curiam).

### 3. Notice of a Mandatory Life Sentence

Young contends that he did not receive notice of the life sentence that, based on his two prior

drug felony convictions, was mandatory if he was found guilty. Young notified the court at oral

---

[1]A defendant's decision not to accept a curative instruction from the district court "undercuts his argument that the comments compromised the integrity of the trial." *Wimbley*, 553 F.3d at 460.

argument that he waived this argument insofar as it related to ineffective assistance of counsel. Young continues to allege that the court should have provided him notice of the possibility of the sentencing enhancement.

By statute, the prosecutor has a duty to provide notice of an intent to rely on prior convictions. Sentence enhancements based on prior convictions cannot apply "unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). The prosecutor filed an information on September 26, 2006 that complied with § 851(a)(1).[2] The trial began on August 1, 2007. Accordingly, the prosecutor complied with the requirements for providing notice of the applicable sentencing enhancements and Young–or at least Young's attorney–was on notice for nearly a year that Young's prior convictions would lead to sentencing enhancements if Young was found guilty.

Similarly, the district court did not violate any obligation it had toward Young. At his arraignment, the district court informed Young of the possible sentence range. The district court did not make clear at arraignment that Young faced a mandatory life sentence, but, as the prosecutor had not yet filed its information informing the court of Young's prior convictions, the district court did not know that Young faced a mandatory life sentence. Therefore, the district court could not have been remiss in not informing Young of the prospect of a mandatory life sentence.

**4. The Basis for a Mandatory Life Sentence**

---

[2]The prosecutor then amended the information on November 21, 2007 to remove one conviction from consideration.

One of the two prior convictions that led to Young's mandatory life sentence was a conviction Young received just under a month before his eighteenth birthday. He was convicted as an adult and sentenced by a South Carolina state court for possession with the intent to distribute crack. Young challenges the inclusion of this conviction in the calculation of his sentence.

Congress provided that a life sentence is mandatory if the defendant is convicted "after two or more prior convictions for a felony drug offense have become final." 21 U.S.C. § 841(b)(1)(A). Congress defined a felony drug offense as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). This provision provides the exclusive definition of felony drug offenses for the statute. *Burgess v. United States*, --- U.S. ----, 128 S. Ct. 1572, 1577 (2008).

We do not need to decide whether Congress intended this provision to include convictions received by juveniles as a result of a juvenile adjudication. Young was convicted as an adult in an adult court. He was convicted of possessing drugs with the intent to distribute, and he was eligible for fifteen years in prison. Thus, he was convicted of a felony drug offense as defined by Congress.[3]

**B. Dawkins**

---

[3]Young argues that § 4A1.2(c) of the Guidelines indicates that juvenile convictions are never counted as prior offenses. This fails to acknowledge the phrase "juvenile *status* offenses." Further, putting to one side the difficulty of using a Guidelines definition to determine the meaning of a term used in a statute, Young overlooks the next subsection of the Guidelines. Section 4A1.2(d) provides that convictions for offenses committed prior to age 18 are considered in sentencing if the defendant was convicted as an adult, and received a sentence of imprisonment exceeding one year and one month.

Dawkins asserts that the prosecutor engaged in misconduct during closing arguments. Prosecutorial misconduct involves mixed questions of fact and law that are reviewed de novo. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). As Dawkins did not object before the district court, his claim of prosecutorial misconduct is reviewed for plain error. *Id.* Plain error requires that "(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006).

We apply a two-step process to determine if misconduct has occurred. First, we determine whether the remarks were improper. *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003). If the remarks were improper, we then determine whether the remarks were sufficiently flagrant to warrant reversal. *Id.* "There are four factors that we utilize to determine if an improper statement was flagrant: 1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong." *Id.*

Where the misconduct allegedly occurred during closing argument, we give "wide latitude" to the prosecutor, looking at the comments in "the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *Henry*, 545 F.3d at 377 (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). The court examines not only the prosecutor's comments but also the defense counsel's conduct and whether the prosecutor reasonably responded to defense attacks. *Id.*

Dawkins contends that the prosecutor engaged in misconduct during closing argument when the prosecutor stated, "You may not like Rickey Story.  I don't like Rickey Story.  He's not a nice person.  He's a drug dealer.  *He's apparently fond of white females*.  He's been dealing drugs since he was in his teens, since 1994."  (J.A. at 698-99) (emphasis added).  The government argues that the remark was not improper because it was in response to defense counsel's closing argument, which attacked Story's character on many grounds, including his treatment of his wife and girlfriends.

The defense counsel's argument did not mention the race of any of the women with which Story had relationships.  Despite the government's assertion that the race of the women was clear since each of the women had testified, there is absolutely no indication in the record that defense counsel argued Story was a bad person because he liked white women.  The prosecutor simply was not responding to an argument by the defense that referenced the race of the women involved.  *Compare United States v. Roach*, 502 F.3d 425, 435 (6th Cir. 2007).  Thus, the comment was improper.

Finding that the prosecutor made an improper comment, however, does not end the analysis.  A prosecutor's misconduct must be flagrant to warrant reversal.  *Galloway*, 316 F.3d at 633.  Moreover, as Dawkins's counsel did not object to the comment, the misconduct must also rise to the level of plain error.  *Henry*, 545 F.3d at 376.  There is no evidence that the comment was intended to mislead the jury or prejudice the defendant.  The prosecutor's comment was about Story–not Dawkins or any of the other defendants.  It was an isolated statement, and it does not appear to have been deliberately placed before the jury.  Nothing else in the prosecutor's closing argument suggests

that the prosecutor was deliberately injecting race into the jury's deliberations. Further, the evidence against Dawkins was overwhelming. Given the wide latitude prosecutors receive in closing arguments, *Henry*, 545 F.3d at 377, we find that the comment was not flagrant and did not constitute plain error.

Dawkins also argues that the government violated the Fourth Amendment in presenting evidence of text messages obtained pursuant to a Title III wiretap. Dawkins did not file a motion to suppress before trial. He also did not object to the admission of the text messages.

A motion to suppress evidence must be made before trial. FED. R. CRIM. P. 12(e). We are "categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal." *United States v. Jordan*, 544 F.3d 656, 666 (6th Cir. 2008) (quoting *United States v. Crimson*, 905 F.2d 966, 969 (6th Cir. 1990)); *see also United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006). As Dawkins did not file a motion to suppress the text messages, we lack jurisdiction to address the issue on appeal.

Dawkins raises a variety of other issues on appeal including evidentiary challenges. Several of these issues, such as his counsel's failure to challenge the racial make-up of the jury, are better raised through 28 U.S.C. § 2255 as claims of ineffective assistance of counsel. *See United States v. Gonzalez*, 501 F.3d 630, 644 (6th Cir. 2007) ("[B]ecause a full understanding of those issues is not readily discernable from the present record, we find no reason to depart from our established practice of deferring consideration of such claims to a proceeding properly filed under 28 U.S.C. § 2255."). After careful review of the remainder of his arguments, the record on appeal, and the applicable law, we find that none of his arguments present grounds for reversal.

## C. Grooms

Grooms challenges the sufficiency of the evidence supporting her conviction for conspiracy to distribute five grams or more of cocaine base. Specifically, she alleges that the jury may have relied on evidence of her criminal conduct as a juvenile. In determining whether there is sufficient evidence, the court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)). In considering the sufficiency of the evidence, the court does not "weigh the evidence, consider the credibility of witnesses or substitute its judgment for that of the jury." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). Because Grooms made a motion for a new trial, she preserved her objection to the sufficiency of the evidence.[4] *United States v. Gardner*, 488 F.3d 700, 709 (6th Cir. 2007).

Grooms turned eighteen on December 18, 2004. The evidence in the record after that date is sufficient to support her conviction. Collins testified that, after he moved in with Story and Grooms in 2005, he saw Grooms sell crack for Story every day. He testified that the crack was sold, on average, "a gram or 2" at a time. Demery testified that, in 2006, she had conversations with Grooms about Grooms selling crack for Story and that, also in 2006, Demery overheard Story and

---

[4]To the extent that Grooms's appeal is an appeal from the district court's denial of a motion for a new trial, it also fails. We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2008). For the reasons set forth in the discussion of the sufficiency of the evidence, the district court did not abuse its discretion in denying Grooms's motion for a new trial. *See id.*

Grooms discussing Grooms selling crack. Story testified that Grooms distributed crack for him in 2005. In addition, the government presented transcripts of telephone conversations and text messages between Grooms and Story from 2006. In one, Grooms asked Story for "half of an onion." Testimony at trial indicated that onion is slang for 28 grams of cocaine.

A jury could reasonably find that, after Grooms turned 18, she was part of a conspiracy that involved more than five grams of cocaine. To the extent that Grooms challenges the nature of the testimony against her, such a challenge is not a viable attack on the sufficiency of the evidence. *See Chavis*, 296 F.3d at 455.

## III.

We **AFFIRM**.