NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0735n.06

No. 13-2056

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Sep 22, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES |
| | ) | DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| KEITH McCLOUD, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

_____

BEFORE: BOGGS, BATCHELDER, and WHITE, Circuit Judges.

BOGGS, Circuit Judge: Keith McCloud appeals his convictions of wire fraud, bank fraud, and making false statements in connection with fraudulent real estate transactions. For the reasons discussed below, we affirm McCloud's conviction.

I

In December 2010, McCloud was indicted on one count of conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349, and three counts of bank fraud, in violation of 18 U.S.C. § 1344. A superseding indictment followed less than a week later. It added three counts of false statement, in violation of 18 U.S.C. § 1014.

From 2005 to 2006, McCloud made a series of ill-fated real-estate purchases in Detroit, Michigan. An acolyte of Carlton Sheets, a well-known real-estate investment guru, McCloud sought to purchase real estate according to a system that required little or no money in down-payment and promised to generate immediate income. (Appellant's Br. at 1). In all, McCloud bought fourteen properties in Detroit, all of which he obtained by financing. His speculative

1

ventures were not to last long, however. In short order, McCloud found himself unable to service so much mortgage debt (over $1,000,000) and soon all of his properties went into foreclosure. McCloud eventually declared bankruptcy.

As an officer in the Detroit Police Department, McCloud had neither income nor savings commensurate with the amount of debt he sought to carry. In order to obtain the financing necessary to effect his real estate purchases, McCloud lied to his lenders, misrepresenting or failing to disclose financial transactions and conjuring income, savings, and lease revenue out of whole cloth. All the while, McCloud attested to the accuracy of the information provided and when asked by lenders for supporting information, he invented it. As the scheme involved many separate transactions, we recount a few illustrative examples of the misrepresentations by which McCloud obtained financing.

McCloud lied to prospective lenders about his assets, claiming to have $58,000 in savings when in reality he had only $2,000. He failed to disclose the $5,000 payments provided by the sellers following closing. McCloud should have recorded these payments on his HUD-1 forms that ought to reflect all payments between the parties to a real-estate sale. Additionally, the checks by which the payments were remitted typically bore fraudulent descriptions on the memo line indicating that they were for expenses like "repairs." McCloud also lied about his income, claiming revenue from rental properties that did not exist. In one case, when lenders asked for verification of McCloud's rental information, he provided forged leases to support the misrepresentations he made on the loan application. Had McCloud not misrepresented his income and assets and had he not provided falsified documentation, the lenders would not have funded his real estate purchases.

Following a jury trial, McCloud was found guilty on all counts. He was sentenced to one day of imprisonment with time served, supervised release for three years, and restitution of just over $27,000. McCloud timely appealed.

## II

### A

McCloud's first argument on appeal is that the prosecution's use of three of his signatures on required court documents amounts to unconstitutionally compelled testimony in violation of the Fifth Amendment's protection against self-incrimination. It does not.

We review McCloud's claim of a violation of the right against self-incrimination for harmless error. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) ("When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the evidence was harmless beyond a reasonable doubt.").

Before we determine if an error is harmless, we must ascertain whether any error was committed at all. The Fifth Amendment protects defendants from compelled self-incrimination. However, not all compelled acts fall under the Fifth Amendment—the protection only attaches to "compulsion of an accused's communications . . . and the compulsion of responses which are also communications . . . not compulsion which makes a suspect or accused the source of real or physical evidence." *Gilbert v. California*, 388 U.S. 263, 266 (1967) (internal quotation marks omitted).

In other words, requiring defendants to produce "real" or "physical" evidence is not a violation of the Fifth Amendment. *See United States v. Euge*, 444 U.S. 707 (1980) (allowing

3

IRS to require handwriting samples); *United States v. Wade*, 388 U.S. 218 (1976) (allowing compulsion of a voice exemplar); *United States v. Mara*, 410 U.S. 19 (1973) (allowing compulsion of a handwriting exemplar); *Schmerber v. California*, 384 U.S. 757 (1966) (allowing compulsion of a blood sample). Fundamentally, a defendant is not protected from compulsion "where the evidence is not related to some communicative act." *United States v. Williams*, 704 F.2d 315, 317 (6th Cir. 1983) (internal quotation marks and alterations omitted).

The three signatures provided by McCloud were on his acknowledgement of the indictment, a document for his appearance bond, and on his acknowledgement of the superseding indictment. McCloud argues, reasonably, that the signatures were compelled because if he did not provide them, he would not have been released from custody. (Appellant's Br. at 25). However, these signatures were the very type of handwriting exemplar that falls outside the protection of the Fifth Amendment. They were signatures used by the prosecution for their physical characteristics and not for their content as communicative expression. *Gilbert*, 388 U.S. at 266–67 ("A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the Fifth Amendment's] protection.").

McCloud is correct that there are cases where the compulsion of writing moves from the realm of the physical into the testimonial, as in *United States v. Campbell*, 732 F.2d 1017, 1021 (1st Cir. 1984). There, the handwriting sample consisted of a dictated statement taken for the purpose of demonstrating how the defendant spelled particular words. This violated the Fifth Amendment because it was a communicative act and not merely a handwriting sample. *Ibid*.

To rescue his claim on appeal, McCloud attempts to argue that the signatures conveyed communicative content like the sample in *Campbell*. He argues that, since one of his defenses

was that he was too unsophisticated to understand what he was signing, the *compelled* signatures on the court documents say that he was, in contrast, sufficiently sophisticated to understand his indictments and bond requirements. (Appellant's Br. at 27). That is not what the signatures convey. They were introduced as signature exemplars to compare to the signed real-estate documents that McCloud disavowed and were thus not communicative in their own right, even in the context in which they appeared. Accordingly, there was no error and we need not continue to the second step of harmless-error review.

B

McCloud next argues that the prosecution engaged in misconduct throughout the trial by (1) soliciting false testimony by the prosecution's witnesses; (2) failing to conduct a thorough investigation (3) using prejudicial language; and (4) withholding the production of discovery material until too late in the trial. "Allegations of prosecutorial misconduct contain mixed questions of law and fact that we usually review de novo." *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008).

1

First, McCloud claims that agent Carty, the prosecution's witness, lied in his testimony. McCloud correctly recited the requirements to establish a claim of prosecutorial misconduct for false testimony. Such a demonstration requires the satisfaction of three conditions: "[T]he defendant must show that the statement in question was false, that the prosecution knew it was false, and that it was material." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). Further, the defendant must show that the statement was "indisputably false." *United States v. Lochmondy*, 890 F.2d 817, 823 (6th Cir. 1989).

5

Four statements were identified by McCloud to support this claim. (1) Carty's admission that he misidentified Nick Wilson as Nick Lemmons to the grand jury; (2) an alleged misrepresentation by Carty of McCloud's statements regarding a letter by McCloud in evidence; (3) Carty's statement that he did not call Mortgage Max, one of the brokers McCloud frequently did business with, a "crooked" company; and (4) Carty's statement that the defendant referred to his unrecorded $5,000 payments as "kickbacks," which Carty later retracted. (Appellant's Br. at 32–33).

McCloud necessarily fails to demonstrate prosecutorial misconduct in the case of all four statements because, though he claims the statements to be "indisputably false" (satisfying the first condition), he offers no argument or evidence either that the statements were known by the prosecution to be false or that the statements were material. (Appellant's Br. at 31–34).

2

The second basis advanced to support McCloud's claim of prosecutorial misconduct is the prosecutor's alleged "failure to investigate" a litany of various people and events connected to McCloud's real-estate practices. (Appellant's Br. at 30–31). The argument set forth is minimal, to say the least.[1] McCloud is correct, however, when he states that "there is no specific requirement that the government investigate other potential perpetrators." (Appellant's Br. at 36–37). Prosecutors have no duty to bring charges or launch investigations into anyone. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.").

---

[1] In fact, the only law cited in this sub-section of his brief, *United States v. Abboud*, is a case concerned with prosecutorial misconduct by prejudicial statements, not failure to investigate. 438 F.3d 554 (6th Cir. 2006).

If McCloud is trying to make out a claim for selective or discriminatory prosecution, such a claim requires a showing, prima facie, "(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (internal quotation marks omitted). If that was McCloud's aim, he has failed to allege a single fact in support of the second part of the test. There is no evidence of bad faith. The closest his argument comes to is an allegation of incompetence. There is no merit in McCloud's failure-to-investigate claim.

3

McCloud also argues prosecutorial misconduct on the basis of prejudicial statements by the prosecutor at trial. These included about a dozen occasions when the prosecutor referred to the $5,000 time-of-closing payments as "kickbacks." (Appellant's Br. at 30).

In order to show that a prosecutor's prejudicial statements amount to prosecutorial misconduct, McCloud would have to "demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005). Flagrancy itself is determined by considering four factors: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Ibid*.

As an initial matter, it is doubtful whether the prosecutor's use of the term "kickback" was improper at all. The government, convincingly, argues that the term kickback means "a return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." *Black's Law Dictionary* (9th Ed. 2009); (Appellee's Br. at 21). The facts of the case, as admitted by McCloud, are that he was in the habit of taking payments of $5,000 from the sellers of the houses at closing. McCloud also admits that these payments were not recorded as required in the properties' HUD-1 forms. (Appellant's Br. at 4, 5, 9, 10). In other words, they were secret.

Even if the use of "kickback" was improper, it also has to be flagrant in order to qualify as prosecutorial misconduct. Examining the *Bates* factors, it is clear that the use of the term kickback was not flagrant.

The first factor, whether the remark "tended to mislead the jury or prejudice the defendant" is either very slightly in favor of flagrancy or wholly neutral. If the term "kickback" is an accurate description of the payments, it cannot be said to mislead the jury nor, for that matter, prejudice them. Jurors will get an accurate understanding of the nature of the payment from a term that is correctly chosen to describe it. If, on the other hand, it was not an accurate description, then the pejorative connotations of "kickback" could prejudice a jury. However, the effects are probably not that great, especially given a relatively few uses of the term during the course of a trial involving multiple undisclosed payments.

The second factor weighs against a finding of flagrancy. The prosecutor used the term "kickback" only twice while putting on his case following the defendant's initial objection. He used it once again in closing arguments when he summarized the evidence that had been

presented at trial. Three uses of the term "kickback" in the course of a multi-day trial is hardly "extensive."

The third factor, whether the comments were deliberately or accidentally made, weighs strongly against a finding of flagrancy. Following McCloud's objection, the prosecutor only used the term twice while putting on his case. Both times he spoke in error, calling the references "a slip" and "a slip of the tongue." In both cases he was immediately corrected by the defendant's objection. The final time he said "kickback" was in closing arguments when he was under the impression that it was acceptable for him to characterize the evidence presented as he did. Following objection from the defense, the prosecution submitted that the use of "kickback" was an acceptable characterization of the evidence presented: "Your Honor, this is argument. It's proper argument." Regardless, the court disagreed, sustaining the objection of the defense and instructing the jury to disregard the use of the term "kickback." In every case after the defendant's initial objection, the prosecution said "kickback" either by clear mistake or in mistaken belief that it was acceptable to use the term at that phase of the trial.

The final factor, the total strength of evidence against the defendant, weighs heavily against a finding of flagrancy. There was a great deal of evidence against McCloud in the form of clandestine payments (the "kickbacks"), falsified rental agreements, and false statements to lenders regarding the source of funds in his bank accounts. The three uses of the term "kickback" were not grave compared to the overwhelming evidence that was put before the jury.

It is probable that there was no impropriety. It is certain that under *Bates* there was no flagrancy and thus no prosecutorial misconduct based on prejudicial statements.

The final basis alleged in support of McCloud's claim of prosecutorial misconduct was the prosecutor's alleged failure to turn over discovery material. McCloud identifies two categories of material that he alleges the prosecutor withheld. First, he points, rather vaguely, to discovery material, including bank statements, that the government "withheld until the eve of trial." (Appellant's Br. at 38). Second, McCloud claims that the rough notes of interviews conducted by Agent Carty were withheld until midtrial. Because McCloud raised contemporaneous objections to the timing of the prosecution's production of the discovery material, the admission of the evidence is reviewed for abuse of discretion while the court's legal conclusions are reviewed de novo.

Despite its characterization by McCloud, neither of the production claims are true *Brady* claims. In order to establish a *Brady* violation, the defendant must show that a prosecutor's failure to produce meets the following three requirements: "[t]he evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see Brady v. Maryland*, 373 U.S. 83 (1963).

Were we to attempt to read a properly-articulated *Brady* claim into McCloud's argument on appeal, in the case of the bank statements, he fails on all three fronts. The evidence was not favorable to McCloud, in fact it was deeply inculpatory, showing, among other things, that he misrepresented to lenders both the balance of his savings accounts and the source of payments from third parties. The evidence was not suppressed by the prosecution. It was obtained by the prosecution and produced to the defense on the same day. Finally, there was no prejudice from

the failure to produce. The court granted a one-day continuance in order to provide an opportunity for the defense to review the bank statements.

The same is true of the handwritten notes produced by Carty during his interviews with McCloud and Randy Day. They were produced, by order of the court, before the conclusion of Carty's testimony. The handwritten notes fail both parts of *Brady*. First, the evidence contained within Carty's notes was neither exculpatory nor was it usable for impeachment and, on appeal, McCloud does not argue otherwise. Without explaining how the handwritten notes were favorable to his case, McCloud claims misconduct based on no more than the mere fact that the notes were produced during trial instead of before trial. Second, the evidence was not suppressed. A typed report was provided in advance of trial that contained the information in the notes and, when the notes were demanded by the defense, they were provided by the prosecution while the trial was still ongoing. Since they were provided before the conclusion of trial, and cross-examination was still available to the defense regarding any subject that might have appeared in the notes, there was no prejudice.[2]

C

Finally, McCloud appeals his conviction based on a claim of insufficiency of the evidence. When sufficiency of the evidence "is challenged on appeal, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996) (internal alterations omitted).

---

[2] It is true that the prosecution has an obligation under Rule 16(a) to disclose "the portion of any written record containing the substance" of a defendant's oral statement. Fed. R. Crim. P. 16(a)(1)(B)(ii). However, the production of such evidence during trial does not necessarily cause prejudice especially, as in this case, when the substance of the record had been produced before trial began in the form of the prosecution's typewritten report. *See United States v. Clark*, 385 F.3d 609 (6th Cir. 2004); *see also United States v. Ganier*, 468 F.3d 920, 927 (6th Cir. 2006) (detailing the sanctions available for the prosecution's failure to produce evidence in accordance with Rule 16, including a three-factor test to determine if suppression is the correct remedy).

McCloud confines his argument on appeal to a claim that the prosecution did not present sufficient evidence to demonstrate knowledge, an element common to all three offenses of which McCloud was convicted. The question, therefore, is whether *any* "rational trier of fact" could have found this element beyond a reasonable doubt.

A rational juror could have found knowledge. McCloud misrepresented important information about his financial status on loan documents. He provided forged leases to bolster an image of credit-worthiness. He hid the existence of the $5,000 payments by the sellers and tried to obscure them by representing them as payments for repair work. McCloud claims that the signatures on some of the documents were not his. Even if that is true, McCloud did provide false financial information and he did hide financial transactions from his lenders and he did produce false leases to demonstrate fictitious income. In light of so many deliberate acts, a rational trier of fact could find that McCloud had the requisite knowledge to support his convictions.

### III

For these reasons, we AFFIRM the district court's judgment.